**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| LUDLOW EXCHANGE, LLC d/b/a NOVIG,<br><br>Plaintiff,<br><br>- vs. -<br><br>CATHERINE L. HANAWAY, in her official capacity as Attorney General of the State of Missouri; MICHAEL A. LEAR, in his official capacity as Executive Director of the Missouri Gaming Commission; and JAN M. ZIMMERMAN, in her official capacity as Chair of the Missouri Gaming Commission,<br><br>Defendants. | Civil Action No. 4:26-cv-1780 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Novig"), by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Defendants Catherine L. Hanaway, Michael A. Lear, and Jan M. Zimmerman, each sued in their official capacity (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1. Novig brings this action to enjoin Defendants from enforcing Missouri's preempted gambling and sports-wagering laws against federally regulated transactions that Congress placed within the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").

2. Novig, Inc. was founded in 2021 with the goal of providing sports-based event contracts to customers across the United States. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur. To pursue that goal under federal regulation, Novig, Inc. formed Plaintiff Ludlow Exchange, LLC d/b/a Novig as its wholly owned subsidiary on October 14, 2025, for the purpose of operating as a CFTC-regulated

Designated Contract Market ("DCM"). Novig pursued and obtained the relevant federal designation in 2026. On June 16, 2026, the CFTC designated Novig as a DCM after conducting the thorough review prescribed by the Commodity Exchange Act (the "CEA" or the "Act"). As a DCM, Novig is subject to the CFTC's 23 "Core Principles," along with the broader CFTC regulatory framework. 7 U.S.C. § 7(d). On August 12, 2026, Novig amended its Rulebook, adding Chapter 14, which focuses on responsible trading standards.[1] Novig offers event contracts to customers located in Missouri.

3. The event contracts Novig lists are a type of derivative instrument that is extensively regulated under federal law and that can be listed, traded, and settled only on federally registered exchanges. In particular, event contracts are quintessential "swaps" as defined by the CEA and therefore can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the CFTC. Congress granted the CFTC "exclusive jurisdiction" over precisely such transactions, 7 U.S.C. § 2(a)(1)(A). Under the CFTC's supervision, event-contract markets have flourished. These still-growing markets have become a multi-billion-dollar industry as investors, market participants, and the public at large have found event contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks. Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2026 alone.

4. On September 17, 2026, Missouri Attorney General Catherine L. Hanaway issued a cease-and-desist letter to Novig, threatening legal action unless Novig ceases offering sports event contracts to Missourians or obtains Missouri Gaming Commission licensure.[2] The letter states that

---

[1] *See* Ludlow Exchange, LLC, Self-Certification of Rule Amendments Establishing Responsible Trading Standards (Aug. 12, 2026).

[2] Letter from Catherine L. Hanaway, Att'y Gen. of Mo., to Ludlow Exchange, LLC d/b/a Novig (Sept. 17, 2026).

Novig has 30 days, until October 17, 2026, to comply or else Missouri "will pursue available enforcement actions against Novig." In an accompanying press release, Attorney General Hanaway stated that Missouri "will enforce the rules voters approved and protect consumers."[3]

5. Novig brings this action to prevent Defendants from bringing this preempted enforcement action against Novig.[4]

6. Under Defendants' view, sports event contracts offered to persons in Missouri constitute unlicensed sports wagering under Mo. Const. art. III, § 39(g), and may be offered only through a Missouri Gaming Commission-licensed operator and subject to Missouri's tax and regulatory requirements, irrespective of the CFTC's designation of the exchange or the CFTC's treatment of the contract.

7. The CEA forecloses application of Missouri law in this way. The statute's text, history, and context all show that Congress intended to vest the CFTC with centralized authority over regulated derivatives markets and to ensure nationwide uniformity in those markets. Congress gave the CFTC exclusive jurisdiction over "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). Event contracts comfortably fall within the statutory definition of a swap because they are "contract[s]" that "provide[] for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

---

[3] Press Release, Mo. Att'y Gen., Missouri Attorney General Hanaway Orders Unlicensed Prediction Markets To Cease And Desist Unlawful Sports Wagering (Sept. 17, 2026), https://ago.mo.gov/missouri-attorney-general-hanaway-orders-unlicensed-prediction-markets-to-cease-and-desist-unlawful-sports-wagering/.

[4] Attorney General Hanaway also sent cease-and-desist letters to Kalshi, Polymarket, Crypto.com, Underdog, and Robinhood. *See* Press Release, *supra* note 3.

8. Despite the CFTC's exclusive jurisdiction over event contracts, Missouri has stated that it intends to pursue legal action against Novig. But Missouri's threatened enforcement of its laws is preempted. Pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate those transactions. Section 2 of the CEA grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps" that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Novig's event contracts fall squarely within the Act's definition of "swap" because each provides for a payment that depends on the occurrence or nonoccurrence of an event associated with potential financial, economic, or commercial consequences. *Id.* § 1a(47)(A)(ii). And because those swaps are traded on a DCM, they are subject to the CFTC's exclusive jurisdiction. *See id.* § 2(a)(1)(A). The CEA also impliedly preempts Missouri's gambling laws as applied to Novig; the statutory grant of "exclusive jurisdiction" over swaps traded on a DCM evinces Congress's intent to oust states from this field and to be the sole regulator of these transactions. *Id.* § 2(a)(1)(A).

9. Congress's preemptive intent is expressed in the statutory text. When it created the CFTC in 1974, Congress deleted the provision of the Act that had, until then, preserved "any State law applicable" to futures trading, doing so, as its floor sponsor explained, "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis). The conference report stated that the amendments would "preempt the field insofar as futures regulation is concerned" and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.). Indeed, when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "[e]xcept as *hereinabove* provided" in the grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

10. Novig thus seeks declaratory and injunctive relief under the Declaratory Judgment Act and the Constitution. *See* 28 U.S.C. §§ 1651, 2201, 2202. Federal law preempts Missouri law, and this Court has the equitable power to enjoin Defendants from enforcing preempted state gambling laws. *See Ex parte Young*, 209 U.S. 123, 156–60 (1908). Given Missouri's stated view and threatened enforcement, Novig must either risk exposing the company to significant civil and criminal liability or refrain from offering event contracts to Missouri residents altogether. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citation omitted).

11. Absent this Court's relief, Novig will incur irreparable harm. If Novig continues to offer event contracts to its users in Missouri, Defendants may bring an enforcement action premised on the view that Novig is violating Missouri sports-wagering laws, potentially exposing Novig to criminal liability under Chapter 572 of the Missouri Revised Statutes; civil monetary penalties under the Merchandising Practices Act, Mo. Rev. Stat. § 407.020; and abatement remedies under Mo. Rev. Stat. § 572.090. Exposure of that magnitude is substantial, and Missouri's sovereign immunity would place it beyond recovery even after litigation exposes the fatal flaws in Defendants' legal position. These irreparable harms warrant equitable relief. Novig also easily clears the other bars for seeking a preliminary injunction. Both the balance of the equities and the public-interest considerations support this Court's intervention in Novig's favor.

## PARTIES

12. Plaintiff Novig is a limited liability company organized under the laws of the State of Delaware. Novig was formed on October 14, 2025, and is in good standing under Delaware law. Novig is headquartered in New York, New York, and its principal place of business is 169

Madison Avenue, Suite 2199, New York, NY 10016. Novig was organized for the purpose of operating as a DCM regulated by the CFTC, and it conducts no other business.

13. Novig filed its application for designation as a contract market with the CFTC on December 16, 2025. The CFTC has designated Novig as a DCM under Section 7 of the Commodity Exchange Act, 7 U.S.C. § 7. The CFTC granted that designation on or about June 16, 2026, finding that Novig's application and demonstrations established its ability to comply with the Act and the CFTC's regulations applicable to DCMs. The CFTC approved the application subject to the conditions that Novig comply with all representations and submissions made in support of it, that Novig comply with all provisions of the Act and the CFTC's regulations applicable to designated contract markets, and that Novig permit no futures commission merchant to intermediate transactions or carry customer accounts unless the Order of Designation is amended. *See* In the Matter of the Application of Ludlow Exchange, LLC for Designation as a Contract Market, Order of Designation (CFTC June 16, 2026).

14. On August 12, 2026, Novig amended its Rulebook, adding Chapter 14, which outlines Novig's responsible trading commitments. Chapter 14 clearly articulates how Novig protects traders. Only participants at least 21 years of age may trade. Participants may set binding daily, weekly, or monthly limits on their own trading and deposits, and may freeze trading on their accounts for periods ranging from one day to one year. Novig enforces those elections through third-party identity screening, so that a participant cannot open a second account to evade a limit set by the participant, and Novig participates in an industry-wide program allowing participants to engage in an exclusion across multiple prediction-market platforms. Novig also screens for prohibited traders, identifying participants who attempt to transact in markets where they hold undue influence over the outcome or have access to material non-public information. Novig further

invests significant resources in training its employees and increasing public awareness on the importance of maintaining responsible trading best practices.[5]

15. The event contracts at issue in this action are listed, traded, and settled on Novig's federally regulated DCM. Novig's trading model is non-intermediated: contracts trade on an anonymous electronic central limit order book, are cleared on a fully collateralized basis by a derivatives clearing organization, and no futures commission merchant may intermediate any transaction or carry any customer account.

16. Defendant Catherine L. Hanaway is the Attorney General of the State of Missouri and is sued in her official capacity. The Attorney General is the State's chief legal officer and has authority to enforce Missouri's sports-wagering laws. The Attorney General sent the September 17, 2026 cease-and-desist letter to Novig.

17. Defendant Michael A. Lear is the Executive Director of the Missouri Gaming Commission and is sued in his official capacity. The Missouri Gaming Commission administers Missouri's regulated sports-wagering market under Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. § 313.004, including licensing and regulation of sports-wagering operators.

18. Defendant Jan M. Zimmerman is the Chair of the Missouri Gaming Commission and is sued in her official capacity. The Missouri Gaming Commission administers Missouri's regulated sports-wagering market under Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. § 313.004, including licensing and regulation of sports-wagering operators.

19. Together, Defendants are responsible for enforcing any demand that Novig comply with the Missouri sports-wagering and gambling laws that are preempted as applied to event contracts traded on a federally designated contract market.

[5] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

20. Defendants have threatened to exercise that enforcement authority against Novig if, within 30 days from September 17, 2026, Novig does not (i) cease and desist from offering sports event contracts in Missouri or (ii) obtain a license from the Missouri Gaming Commission and pay all associated state taxes and fees.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*., preempts Missouri's sports-wagering and gambling laws insofar as they purport to regulate transactions on a CFTC-designated contract market.

22. The Court may award injunctive relief under 28 U.S.C. § 1651 and may award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

23. The Eleventh Amendment does not bar this action. Novig sues only state officials, in their official capacities, and names no state agency as a defendant. "[A] state official . . . is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc.* v. *Stewart*, 563 U.S. 247, 255 (2011). Under *Ex parte Young*, a plaintiff may sue Missouri officials in their official capacities for prospective declaratory and injunctive relief to stop the threatened enforcement of state law that violates federal law. *Ex parte Young*, 209 U.S. at 156; *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002); *accord St. Paul Area Chamber of Com.* v. *Gaertner*, 439 F.3d 481, 488 (8th Cir. 2006) (citation omitted) ("[W]e encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power."). Novig seeks precisely that relief here.

24. This Court has personal jurisdiction over Defendants. Defendants are domiciled in Missouri and perform their official duties in Missouri.

25. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in Missouri and a substantial part of the events giving rise to Novig's claim occurred in this District. Novig offers event contracts to Missouri residents located in this District and any state enforcement actions would be directed at conduct occurring in this District.

## FACTUAL ALLEGATIONS

### A. Event Contracts Are Derivative Instruments That Allow Market Participants To Hedge Risk And Generate Real-Time Information About Consequential Events.

26. This action concerns derivatives. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The CEA defines the "commodities" that may serve as underliers in sweeping terms so that they cover not only physical goods such as wheat, oil, and gold, but also intangibles such as financial indices, interest rates, and the occurrence or nonoccurrence of an event carrying financial, commercial, or economic significance. *See* 7 U.S.C. § 1a(9), (19).

27. Among the most familiar derivatives is the swap—an arrangement under which two parties exchange payments measured by the value or performance of some underlying reference, whether an interest rate, a commodity price, or a real-world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n* v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014). Event contracts represent a paradigmatic subspecies of swaps because they allow market participants to take positions on whether a future occurrence will materialize. Most are binary: every "yes" position is matched by a corresponding "no" position, and at expiration the party who read the outcome correctly is paid.

28. Take a contract on whether the Kansas City Chiefs will win the NFL Super Bowl. Once that question resolves (whether the Chiefs win the Super Bowl), the contract expires and settles accordingly. The side representing the occurrence (*i.e.*, "the Chiefs win") receives the contract payout, while the side representing the nonoccurrence (*i.e.*, "the Chiefs do not win")

receives nothing. The event contract settles with one side receiving $1 and the other side $0; the specified contingency either occurs or does not occur.

29. These contracts can also, importantly, be traded in the market at any point before the event contract expires. Thus, the contract's price will fluctuate as market participants trade in and out of positions, reflecting the market's real-time views regarding the probability of the underlying future event based on, among other things, new data.

30. Take an example from the 2026 NBA Finals. In Game 4 of the 2026 NBA Finals, the Knicks entered as favorites on prediction markets. As the Spurs built a commanding lead in the game, the markets flipped, and by the start of the fourth quarter, with the Spurs up 95 to 75, the Spurs were priced at around a 99 percent probability of winning the game. Then the Knicks rallied. OG Anunoby tipped in a missed Jalen Brunson three-pointer with 1.2 seconds remaining to complete a record 29-point comeback and a 107 to 106 win, and all the while the markets repriced accordingly. That real-time repricing is the mechanism by which event-contract trading aggregates dispersed information about the probability of the underlying outcome.[6]

31. Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's future earnings—event contracts likewise reflect the market's up-to-date prediction of the probability that a particular event will transpire.

32. Event contracts, like many financial instruments, serve multiple important financial functions. Event contracts can be a form of investment, and they can also serve as a device for mitigating risk for market participants who are already exposed in other ways to the consequences of

---

[6] *Knicks Championship Odds Swing from 62 to 38 to 82 Percent in Game 4 Thriller*, RealGM (June 11, 2026), https://basketball.realgm.com/wiretap/286022/Knicks-Championship-Odds-Swing-From-62-To-38-To-82-Percent-In-Game-4-Thriller.

the underlying event.[7] Sporting outcomes in particular carry economic weight for a wide range of participants. That is unsurprising given that sports are a multi-billion-dollar industry that ripples across the broader economy. Advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and state-licensed sportsbooks all have financial exposure that turns on how games end. Sports-related event contracts let those parties manage that exposure.

33. Several examples neatly illustrate this principle. A regional sponsor whose marketing spend is tied to a team's postseason run can offset the risk of an early exit by purchasing event contracts against the team's championship odds. A hotel whose occupancy depends on whether the local team hosts a home playoff game can protect against that exposure by taking a position against the team's seeding. A broadcaster whose ad revenue turns on ratings for a marquee matchup can hedge the risk that a star player is unavailable by purchasing contracts against that player's participation. A state-licensed sportsbook, whose book concentrates exposure to a particular outcome by design, can offset that exposure on an exchange rather than absorbing it alone. Sports event contracts, in other words, allow market participants to isolate and efficiently price the risk of a single economically consequential occurrence.

34. Beyond hedging, these markets generate valuable information, often in real time. Market participants often research the underlying event's probability before taking a position; thus, their trades may provide valuable information to the public. The depth and breadth of participation also improve the quality of information. Liquidity is therefore critical to price discovery because it allows market participants to move in and out of their positions efficiently. The public benefits from the wisdom of the crowd if the event contract's market is liquid and includes the most well-informed traders.

---

[7] Andrew Ross Sorkin et al., *Hedging, Not Betting, on Sports via Prediction Markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

35. Congress also recognized the twin roles that derivatives play in the national economy by declaring that derivative transactions "are affected with a national public interest by providing" both a means of hedging risk and a mechanism for "disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

**B. Congress Granted The CFTC Exclusive Jurisdiction Over Derivatives Traded On Federally Designated Exchanges, Including Swaps.**

36. Federal supervision of derivatives spans more than a century. Before 1922, these instruments commanded little judicial respect. One court dismissed futures trading as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and the Supreme Court described futures contracts as "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508–09 (1884). Numerous states passed laws to suppress or restrict futures trading of commodities.

37. That view did not hold. Over time, as markets matured and the economic value of derivatives became more apparent, courts and commentators came to recognize these instruments as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905). Congress followed suit by first centralizing futures trading on federally approved contract markets in the Grain Futures Act of 1922, ch. 369, 42 Stat. 998, 1000–02 (1922) ("Grain Futures Act"), and then broadening federal supervision of derivatives exchanges in the CEA 14 years later, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

38. As first enacted, the CEA left "any State law applicable" to covered transactions undisturbed. *Id.* That changed in 1974. Congress created the CFTC to administer the statute and vested it with "exclusive jurisdiction" over transactions in derivatives listed and traded on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A).

39. Congress left no doubt about what it was doing. Alongside the grant of exclusive jurisdiction, it struck the clause that had preserved "any State law applicable" to futures trading. *See*

H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.); 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete"). When the House floated language that would have let state law reach CEA-regulated transactions, the Senate accepted only after amending the provision to clarify that it applied "[e]xcept as hereinabove provided"—that is, subject to the exclusive-jurisdiction grant. *See* 7 U.S.C. § 2(a)(1)(A); S. Rep. No. 93-1131, at 31 (1974). Preemption was a central goal of this legislation. As one commentator put it, "preemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).

40. The concern driving that choice was practical. Congress recognized the obvious point that a national market cannot function under fifty regulators. As one Senator put it, regulation under "different State laws would just lead to total chaos." Commodity Futures Trading Commission Act Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113*, Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark). The House Committee on Agriculture sought to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The conference report was explicit that the amendments would "*preempt the field* insofar as futures regulation is concerned," and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.) (emphasis added).

41. Congress simultaneously widened the statutory definition of "commodity" to encompass "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The purpose

was to capture "futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974).

42. In 2010, Congress further broadened the CFTC's exclusive jurisdiction to cover swaps. The CFTC's exclusive jurisdiction now reaches "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures," and supplied an "explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3, 13 (2019).

43. This statutory history extends in one direction. Congress has legislated three times in this area, and each time, it has decided to enlarge the federal role such that it has become "abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 44–45 (1974).

44. The definition of "swap" is correspondingly broad, covering any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Courts in this Circuit have taken that language at face value, observing that "[t]he CEA's definition of 'swap' is broad, a description that flows from the relevant terms Congress used in § 1a(47)(A)(ii)." *United States* v. *Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026) (citing *United States* v. *Phillips*, 155 F.4th 102, 113 (2d Cir. 2025)); *see KalshiEx, LLC* v. *Bird*, 2026 WL 2691009, at *10 (S.D. Iowa Sept. 8, 2026) ("Granted … the definition of 'swap' in 7 U.S.C. § 1a(47)(a)(ii) refers broadly to '*potential* financial, economic, or commercial consequence[s]'"). After

all, Congress wrote the definition to capture instruments that "in the future become[] commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv).

45. In its October 9, 2026 Notice of Proposed Rulemaking, the CFTC—pursuant to its expressly delegated authority under the CEA—defines a "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." *Further Definition of "Swap" – Inclusions* 1, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58. The CFTC adopted this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.* at 11. As part of its justification, the CFTC discussed the potential economic consequences associated with sports events, such as: increased ticketing revenue and franchise valuation that can accompany postseason success; enhanced viewership during a close game; player contractual bonuses tied to statistical results; and promotions that link the outcome of a sporting event to a financial consequence for a business (*e.g.*, a furniture store in Houston that runs a promotion in which customers who spend a minimum amount receive refunds if the Houston Astros win the World Series). *Id.* at 24–26.

46. Two narrow carveouts accompany the grant of exclusive jurisdiction, and neither is implicated here. One preserves the authority of the Securities and Exchange Commission and other federal agencies over instruments within their statutory mandate. *See* 7 U.S.C. § 2(a)(1). The other leaves the states room to apply generally applicable laws to off-exchange transactions—those not conducted on a DCM—and to unregistered entities. *Id.* § 16(e)(1); *see* H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (States may regulate "transactions outside those preserved exclusively for the jurisdiction of the CFTC").

47. Novig is registered as a DCM, and its contracts trade on an exchange. It is a contract market designated by the CFTC, and the transactions at issue occur on that market. The

off-exchange carveout therefore has no application, and no other federal agency claims these instruments.

### C. The CFTC Comprehensively Regulates Designated Contract Markets And The Event Contracts They List.

48. Derivatives may be offered to the public only on a CFTC-approved DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

49. Such approval does not come easy. An applicant must document its compliance with the 23 Core Principles set forth in the CEA. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a)(2). An applicant must also show that it will observe the Commission's rules; that it will adopt, monitor, and enforce its own rules; that the contracts it lists are not readily susceptible to manipulation; that it has both the capability and the obligation to detect and prevent manipulation, price distortion, and disruption through surveillance, compliance, and enforcement; and that it will impose position limits to constrain manipulation risk. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

50. The obligations do not end at designation. A DCM must assume "a duty of self-regulation, subject to the Commission's oversight," and also is required to "enact and enforce rules to ensure fair and orderly trading." *Am. Agric. Movement, Inc.* v. *Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1150–51 (7th Cir. 1992). A slew of other CFTC regulations govern in painstaking detail various other parts of the entity's operations, from recordkeeping and daily market-data reporting to the public disclosure of certain contract terms and rules and other requirements relating to liquidity, dispute resolution, governance, and auditing. To give one illustrative example, a DCM must extend "impartial access to its markets and services" to every person holding trading privileges. 17 C.F.R. § 38.151(b). An entity may lose its designation if it is found in noncompliance with these regulations.

51. A DCM has two routes to listing a new contract. It may certify in writing, no later than the business day preceding listing, that the contract conforms to the CEA and the CFTC's

rules, 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a); or it may seek the CFTC's approval beforehand, 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). Under the latter route, the CFTC must "approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or its regulations. 7 U.S.C. § 7a-2(c)(5)(B).

52. An entity cannot avoid oversight through certification. The Commission has a 10-day window to "stay[] the certification" for additional review. 7 U.S.C. § 7a-2(c)(3). If the Commission does not act within this period, the new contract is deemed approved. *Id.* § 7a-2(c)(2).

53. Congress also legislated specifically with respect to event contracts. Under the special rule adopted in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), the CFTC may find an event contract "contrary to the public interest" where it "involves" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i) (the "Special Rule"). The CFTC has long taken the position that the Special Rule operates as a "discretionary review framework rather than a self-executing per se prohibition" and that the Special Rule "does not authorize the CFTC to impose a per se prohibition" on the listing of such event contracts independent of a public interest determination. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,811, 35,813, 35,815 (proposed June 12, 2026); *see* 17 C.F.R. § 40.11(a)(1)–(2).

54. Two consequences follow from Congress's decision to give the Commission such authority. The first is that event contracts touching on gaming—which include sports-based event contracts—are within the Commission's exclusive jurisdiction. A grant of power to review them presupposes as much. The second is that Congress opted for a regime of individualized, contract-by-contract analysis rather than the use of categorical, blanket prohibitions.

55. The CFTC is drafting an amendment to the Special Rule regarding whether sports-related event contracts are "consistent with the public interest." *See* 91 Fed. Reg. at 35,836. The CFTC expects this amended Special Rule to become final by the end of November. *See* Resp. to Mot. for Summ. Disposition at 2, *U.S. Commodity Futures Trading Comm'n* v. *Johnson*, No. 26-4281 (9th Cir. filed Sept. 24, 2026), Dkt. No. 29.1 (noting that the CFTC expected the revised version of the Special Rule to become final within the next two months).

56. The CFTC is also equipped with the full panoply of tools necessary to conduct this analysis and ensure regulatory compliance across the industry. The CFTC has the authority to bring actions in federal court or before administrative tribunals, and it is empowered to seek a range of remedies, including civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and suspension, denial, revocation, or restriction of registration and trading privileges. The CFTC may also refer matters to the Department of Justice or state authorities if it finds evidence of criminal conduct. CFTC, Div. of Enf't, Enforcement Manual § 3.3 (2020).

57. In sum, federal law reaches every stage of an event-contract transaction. The CFTC prescribes the procedures by which a contract may be listed and retains authority to review, stay, and prohibit it; designates and supervises the exchange that lists it; and polices the trading that follows.

### D. Novig Sought To Operate Under State Licensing Regimes, Found Them Structurally Incompatible With An Exchange, And Obtained Federal Designation.

58. Novig, Inc.'s founders were familiar with prediction markets from the company's earliest days and came to view that model as the better fit for Novig's product. Novig, Inc. did not initially pursue federal designation because, in the regulatory environment then prevailing, it anticipated that federal approval could take years and offered no assurance that sports-related event contracts would be permitted. Novig, Inc. therefore first pursued state-by-state licensing, securing a

Colorado license in October 2023, before returning that license in April 2024 and later pursuing a federally regulated prediction-market model.

59. Novig, Inc. was founded in 2021 by Jacob Fortinsky and Kelechi Ukah and was incorporated in Delaware on March 3, 2021.

60. Novig, Inc.'s founders conceived the company after observing that established sportsbooks routinely limited or banned customers who won too often, treating a successful bettor, in the words of its chief executive, "the same way a casino treats a card counter." The company sought to eliminate that practice. Its exchange structure removes what the company describes as "unfair odds and punitive limits on winning traders," and produces prices driven by real-time supply and demand rather than by bookmaker discretion.

61. Indeed, the Novig name is a homage to the key distinctions between event-contract platforms and sportsbooks. Traditional sportsbooks make money by adjusting the odds so that they include a commission for the sportsbook to cover the costs of facilitating the wager. This commission is called "vigorish" or "vig" in the language of sportsbooks. The Novig name reflects a business model in which the company does not charge a "vig."[8]

62. Novig, Inc. did not begin by seeking federal designation. It first attempted to operate within precisely the state licensing framework that Defendants now seek to enforce against Novig. On September 21, 2023, the State of Colorado Department of Revenue, Division of Gaming approved an Internet Sports Betting Operator license for Novig Laboratories, LLC d/b/a Novig, and the company launched its product in that State in October 2023.

63. Colorado's regulations recognized exchange wagering as a form of sports wagering, defining "exchange wagers" as "a form of wagering in which two or more persons place identically opposing wagers in a given market, allowing patrons to wager on both winning and non-winning

[8] *See* Novig, "Exchange vs Sportsbook," https://novig.com/blog/exchange-vs-sportsbook (Oct. 9, 2026).

outcomes in the same event." 1 Colo. Code Regs. § 207-2:1.4(8). Yet in 2023 Colorado declined to adopt proposed rules for exchange wagering. Novig, Inc. sought their adoption through the process the State provided. It participated in at least two stakeholder meetings, and on December 13, 2023 formally requested that Colorado "prioritize the passage of exchange wagering regulations," stating that it was "fully prepared to comply with any additional regulations or guidelines" the State might set. The company thereafter proposed a modified feature and met with the Division of Gaming to explain this feature. On February 9, 2024, the Division determined that the proposed feature would constitute exchange wagering and advised the company to "wait until appropriate proposed rules are not only voted on by [Colorado] but, if applicable, go into effect."

64. That effort demonstrated why a state-by-state licensing model is structurally incompatible with an event-contract exchange. The traditional framework was designed for sportsbooks—operators that act as counterparties to every wager, set their own prices, and earn revenue from the spread between those prices and true probability. An exchange earns no vig and takes no position. It depends instead on liquidity: a trade can occur only if a buyer and a seller can be matched at the same price. Confining an exchange's participants within a single state's borders deprives it of the counterparties that make the market function at all. Novig, Inc. encountered further difficulty with other state regulators. Regulators are often incentivized to protect incumbent operators over a lower-margin product like Novig's that would reduce state tax revenue. A licensing regime calibrated to the economics of the house does not readily accommodate a market with no house.

65. In April 2024, Novig, Inc. withdrew from the Colorado market. It thereafter remitted unpaid patron funds to the Colorado Treasury and, in March 2025, submitted its request to surrender the license and withdraw its associated persons, which the Division of Gaming confirmed it would process.

66. Novig, Inc. formed Plaintiff Ludlow Exchange LLC d/b/a Novig, or "Novig," on October 14, 2025 to pursue a federally regulated prediction market model. Novig applied to the CFTC for designation as a contract market pursuant to Section 5(a) of the CEA, 7 U.S.C. § 7(a), and Commission regulation 38.3(a), 17 C.F.R. § 38.3(a). Novig's application comprised submissions dated January 1, 2026 through June 10, 2026, and included Novig's Certificate of Formation, its Amended and Restated Operating Agreement, its Certificate of Good Standing, its Rulebook, and a narrative demonstrating Novig's compliance with each of the core principles applicable to designated contract markets.

67. On June 16, 2026, the CFTC granted that designation, placing Novig within the same regulatory architecture that governs futures and derivatives exchanges generally. Commission staff reviewed Novig's application, including its rules and the representations Novig made, and conducted a technical evaluation of Novig's operational capabilities to evaluate its compliance with the core principles and corresponding Commission regulations applicable to DCMs under Section 5(d) of the Act, 7 U.S.C. § 7(d), and Commission regulations 17 C.F.R. §§ 38.100–38.1201. The Commission found that Novig's application and demonstrations established its ability to comply with the Act and the Commission's regulations applicable to DCMs, and provided sufficient assurance that Novig would continue to comply.

68. Novig is therefore not an intermediary that routes customer orders to an exchange operated by another entity. Novig is itself the federally regulated exchange. Every contract at issue in this action is listed, traded, and settled on a contract market designated by the CFTC under Section 7 of the CEA. Novig is responsible for ensuring compliant surveillance, using systems and tools that monitor Exchange activity in real time and on a trade-date-plus-one basis, and for enforcing its trading rules. Novig is likewise responsible for compliant regulatory reporting and

recordkeeping, investigations, disciplinary actions, and establishing rules to resolve disputes involving its market participants.

69. Consistent with the seriousness in which Novig takes its obligations, on August 12, 2026, Novig submitted to the CFTC a rule certification adding a new chapter to its Rulebook on "Responsible Trading Standards."[9] The new rules establish binding standards governing, among other things, participant education, marketing, platform design, participant controls, incentive programs, contract review, monitoring and intervention, and age and eligibility requirements. Among other protections, the rules require risk disclosures before trading, tools allowing participants to set limits and cooling-off periods, restrictions on promotional practices that could encourage loss-chasing, monitoring for potentially concerning trading activity, and a minimum trading age of twenty-one.

70. Novig's designation reflects a federal judgment about how these instruments are to be regulated. The CFTC does not regulate casinos or sportsbooks; it regulates markets. In designating Novig, the CFTC found that Novig complied with the statutory and regulatory requirements governing federally designated derivatives markets—the same determination that subjects Novig to comprehensive federal oversight, and the same determination that Defendants' threatened enforcement would nullify.

71. Novig's regulatory history is thus the opposite of evasion. Novig, Inc. sought a state license, obtained one, and complied with it. It relinquished that license only after concluding that the state framework could not accommodate an exchange model, and it thereafter obtained federal designation through the process Congress established for exactly this category of instrument.

---

[9] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

Defendants now seek to apply to Novig the very state licensing regime that the company tested, found structurally unworkable for an exchange, and lawfully exited.

### E. Missouri Has Threatened To Enforce Its Sports-Wagering Laws Against Novig.

72. Missouri's constitution has long prohibited gambling under Mo. Const. art. III, § 39. On November 5, 2024, Missouri voters approved Amendment 2, authorizing a regulated sports-wagering market administered by the Missouri Gaming Commission under Mo. Const. art. III, § 39(g). The Missouri Attorney General's September 17 letter describes that framework as requiring online sports-wagering platforms serving Missourians to obtain licensure and comply with related tax and fee requirements.

73. Missouri Amendment 2 makes it unlawful to offer online sports wagering to Missourians without a Missouri Gaming Commission license. The framework imposes a 10% wagering tax on adjusted gross revenue, Mo. Const. art. III, § 39(g)(10)(a), and license fees of up to $500,000, *id.* § 39(g)(6).

74. Missouri's statutory regime imposes criminal liability for offering online sports wagering without a license. "[A] person engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome." Mo. Rev. Stat. § 572.010(4). Missouri prohibits "possession of a gambling device," which refers to "manufactur[ing], sell[ing], transport[ing], plac[ing] or possess[ing], or conduct[ing] or negotiat[ing] any transaction affecting or designed to affect ownership, custody or use of" a "gambling device . . . used in the state of Missouri in the advancement of unlawful gambling activity." Mo. Rev. Stat. § 572.070(2). The state also prohibits promoting gambling, which is defined as "knowingly advanc[ing] or profit[ing] from unlawful gambling or lottery activity by . . . operating a gambling device to the extent that more than

one hundred dollars of money is gambled upon . . . in any one day." Mo. Rev. Stat. § 572.030(1). Illegal promotion of gambling is a class E felony. *Id.* A gambling device is "any device, machine, paraphernalia or equipment that is used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person with a machine." Mo. Rev. Stat. § 572.010(5).

75. Missouri's Attorney General can also seek monetary fines. The state's Merchandising Practices Act prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020. An "unfair practice" is one that "[o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state" and "[p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. Ann. tit. 15, § 60-8.020.

76. In addition to seeking criminal and monetary penalties, the Attorney General is authorized to enjoin a "public nuisance," which is defined as a "room, building, or other structure regularly used for any unlawful gambling activity." Mo. Rev. Stat. § 572.090.

77. On September 17, 2026, the Missouri Attorney General issued a cease-and-desist letter to Novig. That letter demanded that, by October 17, 2026, Novig cease offering event contracts in Missouri or obtain Gaming Commission licensure and pay state taxes and fees. If Novig does not comply, the letter states that the Missouri Attorney General will take legal action against Novig.

78. Any subsequent enforcement action would likely seek injunctive relief and monetary penalties, such as those envisioned in Mo. Rev. Stat. §§ 407.020 and 572.090. Because Mo. Rev. Stat. § 572.030 renders promoting gambling a felony, the Attorney General may also seek criminal

penalties. The threat is not theoretical. Other states have sought civil monetary penalties amounting to billions of dollars and criminal sanction against other DCMs.[10]

79. Compliance with Defendants' demands is not a practical alternative for Novig. Missouri's framework is designed for licensed sportsbook operators, but is structurally incompatible with an event-contract exchange. Licensure would require Novig to confine participants to Missouri and pay Missouri wagering taxes under Mo. Const. art. III, § 39(g)(10)(a). Those requirements would fragment the national liquidity that a CFTC-designated exchange requires, because an event contract can be executed only if a buyer and a seller can be matched at the same price. If Novig were required to make comparable exclusions in every other state that seeks to apply its gambling laws in this manner, each such state would impose comparable geographic limitations. Such geographic partitioning would deprive Novig's markets of the liquidity on which they depend and frustrate the public interest Congress sought to advance in creating a federally regulated national market. Prediction markets aggregate dispersed information most accurately when they are broad, liquid, and open to participants across the country; the wider the pool of informed participants, the more reliably prices track the probability of the underlying event. Carving the market into fifty walled-off state exchanges would thin liquidity, degrade price discovery, and undermine the very informational value Congress recognized in declaring derivatives transactions "affected with a national public interest by providing" a means "for . . . disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Limiting the geographic scope of customers limits the efficacy of the market in ways Congress did not intend.

---

[10] For instance, New York has pursued civil monetary penalties against Kalshi and Polymarket. *See* Notice of Removal, *New York* v. *KalshiEX LLC*, No. 1:26-cv-06550 (S.D.N.Y. Aug. 7, 2026), Dkt. No. 1; Notice of Removal, *New York* v. *QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. No. 1. Similarly, Arizona's Attorney General filed 20 criminal misdemeanor charges against Kalshi. *See* Information, *State* v. *KalshiEX LLC*, Nos. CR2026-000173-001 & CR2026-000173-002 (Ariz. Super. Ct. Maricopa Cnty. Mar. 16, 2026).

80. Novig therefore confronts a stark choice: *abandon* the Missouri market, submit to a licensing regime incompatible with its exchange model, or proceed and face the enforcement action Attorney General Hanaway has publicly promised. Novig has no option but to seek judicial relief.

**CLAIM FOR RELIEF**

**United States Constitution**
**(Supremacy Clause—Preemption by the Commodity Exchange Act)**
**U.S. Const. art. VI, cl. 2**

81. Novig repeats and incorporates by reference each of the allegations set forth above.

82. The Supremacy Clause provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Federal law accordingly "is supreme in case of a conflict with state law." *Murphy* v. *NCAA*, 584 U.S. 453, 477 (2018).

83. "[S]tate laws that 'interfere with, or are contrary to the laws of congress . . .' are invalid." *Wis. Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). A preempted state law is "without effect." *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981); *see Perez* v. *Campbell*, 402 U.S. 637, 652 (1971).

84. Federal law may preempt state law expressly or by implication. *See Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). In the Eighth Circuit, courts recognize three categories of preemption: express, conflict, and field preemption.

> As relevant here, Congress can preempt state law in one of three ways: (1) expressly through statutory language like a preemption clause; (2) implicitly when a state law "conflict[s] with" or stands as an obstacle to federal law; and (3) implicitly by "occup[ying] a legislative field," leaving no room for state law.

*WinRed, Inc.* v. *Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (quoting *Weber* v. *Heaney*, 995 F.2d 872, 875 (8th Cir. 1993)).

85. The "ultimate touchstone" of the inquiry is congressional intent. *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978)).

86. Under any and all of these frameworks, the Missouri laws Defendants have invoked—or may invoke—are preempted to the extent Defendants seek to enforce them against Novig for listing, trading, and settling event contracts on a federally designated contract market. Those laws include Mo. Const. art. III, § 39(g), including §§ 39(g)(1), (6), (10)(a), and (15); any implementing Missouri Gaming Commission regulations; and any other Missouri law that purports to regulate Novig's listing, trading, or settlement of event contracts on a designated contract market, which include, but are not limited to, Mo. Rev. Stat. §§ 407.020, 572.030, 572.070, and 572.090.

87. The CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A).

88. A "swap" includes any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

89. The event contracts Novig lists satisfy each element of that definition. Each contract is an agreement providing for payment. Each payment depends on the occurrence, nonoccurrence, or extent of the occurrence of a defined event—the final score, margin, win-loss result, tournament advancement, or statistical performance in a professional or collegiate sporting event. And each such event is associated with potential financial, economic, or commercial consequences.

90. The statutory definition of "swap" is broad. Congress extended the definition to reach instruments that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), and delegated to the CFTC and the Securities and Exchange Commission the authority to "further define" the term, 15 U.S.C. § 8302(d)(1). Congress did not delegate that task to fifty state gaming regulators.

91. The events underlying Novig's contracts sit at the core of the definition. Professional and collegiate sporting outcomes bear on advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and the institutional investors who hold equity in franchises and media rights. They bear as well on state-licensed sportsbooks, whose exposure to those outcomes is concentrated by design and who could use exchange-traded contracts to hedge.

92. The CFTC has reached the same conclusion. Pursuant to the authority provided by Congress, the CFTC published a Notice of Proposed Rulemaking on October 9, 2026 that would define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." *Further Definition of "Swap" – Inclusions* 1, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58. The CFTC adopted this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.* at 11. As part of its justification, the CFTC highlighted the potential economic consequences associated with sports events. *Id.* at 24–26.[11]

93. Swap status does not turn on the subject matter of the underlying event. Congress carved out precisely two underliers from the CEA's reach—onions and motion picture box office receipts. 7 U.S.C. § 1a(9). Sporting events are not among them, and the enumeration of two

[11] In addition to arguing that sports-related event contracts fall within the second prong of the CEA's definition of "swap," 7 U.S.C. § 1a(47)(A)(ii), the CFTC took the position that sports-related event contracts also fall within the first and fourth prongs, *id.* § 1a(47)(A)(i), (iv). *See Further Definition of "Swap" – Inclusions* 13–27, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58.

forecloses invention of a third. *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (the express inclusion of one item implies the exclusion of another left unmentioned).

94. Because the event contracts at issue are swaps traded on a contract market designated under Section 7, they fall within the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A).

95. Congress supplied the preemptive language itself. A grant of "exclusive" jurisdiction excludes others by its terms. The Supreme Court has confirmed that the "plain meaning" of a grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any other body. *Mississippi* v. *Louisiana*, 506 U.S. 73, 77–78 (1992). Where "Congress has made its [preemptive] intent known through explicit statutory language," *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), courts give effect to the statute's "plain meaning," *Cipollone*, 505 U.S. at 521 n.19. Usage at the time of enactment was no different: "exclusive" meant "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," and "exclusive jurisdiction" meant "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive*; *Exclusive Jurisdiction*, *Black's Law Dictionary* (5th ed. 1979).

96. Courts construing § 2(a)(1)(A) have long held that the Act preempts state law regulating futures trading on a federally regulated exchange. *See Am. Agric. Movement*, *Inc.*, 977 F.2d at 1156–57; *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("§ 2(a)(1) of the CEA preempts the application of state law."), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353 (1982); *FTC* v. *Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001); *Kelly* v. *Carr*, 691 F.2d 800, 803 (6th Cir. 1980). The principle has been applied to state gambling law specifically. In *Paine*, *Webber*, *Jackson & Curtis*, *Inc.* v. *Conaway*, the court held the CEA preempted a state gambling statute that would have voided futures contracts, observing that "there unquestionably is a federal interest in whether a state brands commodity transactions as 'gambling' and effectively bars those transactions on federally regulated exchanges." 515 F. Supp. 202, 206 (N.D. Ala. 1981).

97. That principle has now been applied to these precise instruments. *See KalshiEX LLC* v. *Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) ("Here, the Act grants the CFTC exclusive jurisdiction over 'swaps . . . traded or executed on a [DCM],' which include Kalshi's sports-related event contracts." (quoting 7 U.S.C. § 2(a)(1)(A))); *KalshiEX, LLC* v. *Assad*, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) ("We conclude that, based on its plain wording, § 2 preempts state regulation of swaps that are 'traded or executed' on a DCM."); *Minnesota*, 2026 WL 2150211, at *1 ("Plaintiffs have shown that the CEA's grant of exclusive jurisdiction over transactions involving swaps likely preempts across-the-board enforcement of the Minnesota prediction market statute against Kalshi and Polymarket US for a considerable swath of the event-contract trades they host."); *Coinbase Fin. Mkts.* v. *Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026) ("Congress has given the CFTC exclusive jurisdiction to regulate many of Kalshi's sports-related swap contracts. That choice preempts the control defendants seek to exert over Kalshi."); *but see KalshiEX LLC* v. *Schuler*, 2026 WL 2884087, at *18 (6th Cir. Sept. 25, 2026) (holding that Kalshi's sports-event contracts are not swaps, but even if they were, the CEA does not preempt Ohio's or Tennessee's gambling laws).

98. Congress's own history confirms the point. Congress amended the Act in 1974, creating the CFTC to oversee trading on DCMs due to concerns about "a patchwork of state regulations." *Flaherty*, 172 F.4th at 226. "The 1974 amendments also expanded the Act's reach from just agricultural products to all 'goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in.'" *Id.* (quoting 7 U.S.C. § 1a(9)).

99. The presumption against preemption does not apply here. The federal government has regulated derivatives markets continuously since 1922, *see generally Bd. of Trade of City of Chi.* v. *Olsen*, 262 U.S. 1 (1923) (assessing the constitutionality of the Grain Futures Act), and the presumption is not triggered in an area of longstanding federal presence, *see United States* v. *Locke*,

529 U.S. 89, 108 (2000). In any event, express preemptive language overcomes the presumption, and Congress supplied such language when it conferred "exclusive jurisdiction" on the CFTC. 7 U.S.C. § 2(a)(1)(A); *see Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.").

100. Novig does not contend that the Act preempts Missouri's regulation of gambling generally. Missouri remains free to license and police sportsbooks, casinos, and every other form of gambling conducted outside a federally designated contract market. Preemption reaches only trading on a market Congress placed within the CFTC's exclusive jurisdiction. *See Marshall* v. *Green Giant Co.*, 942 F.2d 539, 549 (8th Cir. 1991) ("[P]reemption can occur only if the CEA applies to the events in question.").

101. The CFTC agrees. On October 9, 2026, the CFTC published an Interim Final Rule that codified its longstanding position that casino-style gambling products, including wagers placed on sportsbooks and casino games, are excluded from the "swap" definition and thus the CFTC's exclusive jurisdiction. *Further Definition of "Swap" to Exclude Casino-Style Gambling Products* 40, CFTC RIN 3038-AF81 (Oct. 9, 2026), https://perma.cc/8K55-4PXS. The CFTC adopted this rule to address "the erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," an interpretation that is contrary to the swap definition's "plain text." *Id.* at 9.

102. Neither savings clause in § 2(a)(1)(A) disturbs the exclusive-jurisdiction grant. The first is subordinated in its own text: "[e]xcept as hereinabove provided," nothing in the section supersedes or limits the jurisdiction of other federal or state regulatory authorities. 7 U.S.C. § 2(a)(1)(A). What "hereinabove" precedes is the grant of exclusive jurisdiction, and that grant

controls. The second savings clause preserves the jurisdiction of courts, not of state gaming regulators. The "prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction," and that the "second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction." *Flaherty*, 172 F.4th at 230–31; *accord Minnesota*, 2026 WL 2150211, at *11. And the preservation of state common-law actions carries no implication that Congress left room for state regulatory authority over on-exchange trading; the courts of appeals have long held the opposite. *See Kerr* v. *First Commodity Corp. of Bos.*, 735 F.2d 281, 288 (8th Cir. 1984) (noting the CEA's "wide-ranging scheme of federal regulation"); *Kotz* v. *Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading]."). The carveouts and the exclusive grant operate together, and both point to preemption.

103. The Act's other provisions confirm rather than defeat preemption. Section 16(e)(1) preserves state authority over transactions "not conducted on or subject to the rules of a registered entity." 7 U.S.C. § 16(e)(1)(B)(i). However, "registered entities include DCMs, so that limiting principle does not apply." *Flaherty*, 172 F.4th at 229. Congress addressed state enforcement directly as well. Section 13a-2(1) authorizes state officials to sue over conduct violating the Act or the CFTC's rules, but withholds that authority as to federally registered entities. 7 U.S.C. § 13a-2(1). Congress thus calibrated the role of state officials with respect to this industry rather than leaving it at large, and the role it assigned them does not extend to the exchanges the CFTC designates.

104. Novig is not an unregistered entity operating off-exchange. It is designated by the CFTC, supervised by the CFTC, and subject to suspension or revocation of its designation by the CFTC. *See* 7 U.S.C. § 8(b).

105. Field preemption applies where Congress enacts a "scheme of federal regulation . . . so pervasive . . . that [it] left no room for the States to supplement it," or where a "federal interest is

so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

106. The analysis begins by identifying the field. *See Kansas* v. *Garcia*, 589 U.S. 191, 208 (2020). Courts must take care not to define it "too broadly." *Sikkelee* v. *Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016).

107. The field here is not gambling. It is the regulation of trading on federally designated contract markets—the discrete activity over which Congress conferred exclusive jurisdiction. The Court of Appeals for the Third Circuit so held: "[T]he District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)." *Flaherty*, 172 F.4th at 229. The preempted field is accordingly "transactions involving 'swaps' over which the CFTC has exclusive jurisdiction." *Minnesota*, 2026 WL 2150211, at *14.

108. Congress has occupied that field completely. The Act and the CFTC's regulations govern who may operate a designated contract market, the standards for obtaining and retaining designation, the contracts that may be listed and the procedures for listing them, the conduct of trading, the exchange's surveillance and enforcement duties, its recordkeeping and reporting obligations, its governance, its treatment of participants, and the consequences of noncompliance. *See* 7 U.S.C. §§ 2(e), 6(a)(1), 7, 7a-2, 8(b); 17 C.F.R. pt. 38; 17 C.F.R. pt. 40.

109. Conflict preemption applies where compliance with both state and federal law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941).

110. Missouri's regime is structurally bounded by design. Missouri requires sports-wagering platforms to obtain a license and pay state taxes and fees. On Defendants' theory, an exchange offering sports-related event contracts to Missouri residents must therefore exclude

Missouri residents unless it submits to a state licensing regime incompatible with its exchange model. Mo. Const. art. III, § 39(g)(6), (10)(a). The practical effect is a geographic exclusion from Novig's federally regulated market.

111. Federal law imposes the opposite obligation. A designated contract market must "provide its members . . . with impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1).

112. Beyond the regulatory conflict lies a structural one. An event contract executes only when a buyer and a seller are matched at the same price. An exchange confined to the residents of a single state, and required to replicate that confinement in every other state, does not operate a thinner market; in many contracts it operates no market at all. The obstacle is not the expense of compliance, but rather the destruction of the exchange.

113. State enforcement of the kind Defendants threaten would frustrate Congress's objectives. Congress created the CFTC and conferred exclusive jurisdiction on it to eliminate the patchwork of state regulation and bring futures trading under a uniform national framework. State enforcement of gambling laws against a federally designated contract market "is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. Permitting each state to decide for itself which contracts a federally designated exchange may list would make the most restrictive state's standard the effective national rule—an outcome the CEA was enacted to prevent, and one Missouri's licensing and geographic restrictions make concrete.

114. State law is preempted when its application would directly affect trading on or the operation of a futures market. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156. Applied to a designated contract market, that standard is satisfied. *Minnesota*, 2026 WL 2150211, at *14 ("[I]t appears likely that the Minnesota law will regulate transactions over which the CFTC has 'exclusive

jurisdiction.' Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their express-preemption claims."); *see Raoul*, 2026 WL 2969682, at *18 (finding that Kalshi, Coinbase, and the CFTC "are likely to succeed in demonstrating that several" of Illinois' gambling laws are preempted). Missouri's laws, as Defendants would apply them, would require Novig either to obtain a state license and operate within Missouri-specific restrictions or to exclude Missouri participants, thereby dictating who may transact on Novig's exchange.

115. Defendants' position rests on the premise that these contracts involve gaming and therefore belong to the states. The structure of the Act forecloses that premise.

116. In Dodd-Frank, Congress enacted a Special Rule for event contracts. The CFTC "may determine" that an event contract is "contrary to the public interest" where it "involve[s]" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i). Where the CFTC so determines, the contract may not be listed. Otherwise, it may.

117. That provision presupposes that event contracts involving gaming are within the CFTC's jurisdiction. If such contracts escaped federal authority the moment they touched gaming, the Special Rule would have nothing to operate on, and courts do not read statutory provisions into irrelevance. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("[T]hat kind of superfluity, in and of itself, refutes [petitioner's] reading."). Congress assigned the gaming question to the CFTC, not to the states.

118. Two instruments—an exchange-traded event contract and a wager—may reference the same game, but they are different in kind, and economic resemblance does not determine regulatory classification. The CFTC agrees. When implementing the Dodd-Frank amendments, the CFTC declined to bring traditional insurance products within the swap definition even though those products replicate the economics of instruments that are regulated as swaps, explaining that they had

not been "historically treated" or "regulated" as swaps and were "subject to different regulatory regimes" under state law. Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,211–12 (Aug. 13, 2012). The CFTC's exclusive authority over exchange-traded event contracts leaves untouched the States' longstanding role in regulating wagers accepted by a house. The CFTC has drawn the same distinction between the two market structures, observing that the structure of a prediction market "is inapposite to that of legalized sports gambling, where the gaming company typically controls and adjusts the gambling odds." 91 Fed. Reg. at 35,807 n.6.

119. Novig's exchange functions as a venue. Its revenue does not generally depend on whether any participant's position resolves favorably. Price formation occurs among participants transacting across a national market—the same process that sets a listed security's price on a public exchange. Like other designated contract markets, Novig administers a market-maker function that supplies baseline depth and liquidity so that participants can enter and exit positions efficiently. That function is a standard feature of exchange design rather than a departure from it.

120. The sportsbook model inverts these features. The operator dictates the terms on which it will accept a wager and takes the other side of every one. *See United States* v. *McCoy*, 539 F.2d 1050, 1059 (5th Cir. 1976). Its posted odds express its own exposure and revenue objectives inside a licensed territory rather than the result of competitive bidding. Its economic interest is therefore opposed to its customers because it earns the "vig" priced into those odds. *See United States* v. *Greco*, 619 F.2d 635, 637 (7th Cir. 1980) ("This amount of profit to the bookmaker is commonly referred to as 'vigorish,' 'vig' or 'juice.'").

121. Prices on Novig's exchange are generally set by participants, whose orders match by price and time priority through a non-discriminatory algorithm. Novig's revenue does not depend on whether any participant's position resolves favorably. The practice that gave rise to the

distinction between an exchange and a sportsbook—restricting or excluding customers because they win too often—is the practice Novig was founded to eliminate. Novig applies position and payout limits, as every exchange does, to manage settlement risk and preserve orderly markets; it does not apply them to penalize participants for trading successfully. Novig also makes each participant's historical trading performance available directly in its platform, rather than requiring the request-and-review process a customer must navigate to obtain that information from a sportsbook. A venue that takes no position against its participants has no reason to obscure how they are performing.

122. Congress recognized that hedging on an exchange depends on the presence of willing counterparties, not on a house. *See Curran*, 456 U.S. at 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

123. A party seeking a preliminary injunction must show a likelihood of success on the merits, a likelihood of irreparable harm absent relief, that the balance of equities favors relief, and that an injunction serves the public interest. *Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Novig satisfies that standard.

124. Novig will suffer irreparable harm absent relief, and that harm is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Dakotans for Health* v. *Noem*, 52 F.4th 381, 392 (8th Cir. 2022). A regulated party is irreparably injured when it must choose between abandoning lawful activity and incurring ruinous civil and criminal liability under a preempted state law. *See Ex parte Young*, 209 U.S. at 148. The Court of Appeals for the Sixth Circuit so held on closely analogous facts in *Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025), finding irreparable injury where a State sought to

enforce its wagering law against an out-of-state wagering platform in conflict with a federal statute. Novig stands in the same position.

125. That is the choice Novig faces. If it offers event contracts to Missouri customers, it risks the enforcement action threatened by the Attorney General in the September 17 cease-and-desist letter. Such enforcement action may include criminal penalties pursuant to Mo. Rev. Stat. ch. 572, monetary fines pursuant to Mo. Rev. Stat. § 407.020, and abatement of a public nuisance pursuant to Mo. Rev. Stat. § 572.090. If Novig withholds the product from Missouri, it forfeits access to Missouri participants entirely, sacrifices the liquidity a national exchange requires, and loses customers and goodwill.

126. Courts confronting the same dilemma have found it irreparable. If Defendants pursue enforcement action against Novig, the DCM "will either continue to offer [its] event contracts to [Missouri] users and face potential felony charges, or [it] will need to take steps to exit the market" for its trades in Missouri. *Minnesota*, 2026 WL 2150211, at *16.

127. Loss of goodwill and reputation is irreparable in this Circuit. *See United Healthcare Ins. Co.* v. *AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."). Other courts have found the same harms sufficient in these very cases. *See Minnesota*, 2026 WL 2150211, at *17 ("Such reputational harm and damage to the goodwill that Kalshi and Polymarket US have fostered with users of their platforms adds to the irreparable injury described above.").

128. Sovereign immunity forecloses any later remedy. Because Novig could not recover damages from Defendants even if it ultimately prevailed, the losses it would sustain in the interim are by definition irreparable. *See Minnesota*, 2026 WL 2150211, at *16.

129. Novig need not incur liability before seeking relief. *See Free Enter. Fund* v. *Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010) ("We normally do not require plaintiffs to bet the

farm by taking the violative action before testing the validity of the law."); *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Steffel* v. *Thompson*, 415 U.S. 452, 459 (1974).

130. The balance of equities favors relief. A State has no cognizable interest in enforcing a preempted law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988); *Otto* v. *City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."). It is true that preventing a State from effectuating statutes enacted by its representatives can itself constitute an injury, but that principle presupposes a valid statute. Where the state law is preempted as applied, the State is deprived of nothing to which it is entitled, and the interest it asserts carries correspondingly little weight.

131. Where a state law is likely preempted, the harm to the State from an injunction is correspondingly reduced. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen a state law is likely preempted, the harm to the state by temporarily enjoining enforcement of that law is diminished"); *Raoul*, 2026 WL 2969682, at *18 ("Neither Illinois nor the public has much interest in enforcing laws that are likely preempted."). Defendants retain every enforcement tool should they ultimately prevail. Weighing on the other side are the reliance interests that have formed around a market the CFTC has permitted to operate. Exchanges have devoted substantial resources to building infrastructure that complies with the Act in reliance on the federal designation the CFTC grants, and participants have entered positions on the strength of it. Defendants' theory would unsettle those interests retroactively.

132. The public interest favors relief. "If the Act preempts [state] law, then the public interest is best served by *enforcing* the Act." *Flaherty*, 172 F.4th at 232 (emphasis added). The public also has an interest in the integrity of the uniform national framework Congress designed for derivatives markets, in the informational value of prediction-market prices, which are theoretically

more efficient the broader and more liquid the market, and in the supremacy of federal law. *See United States* v. *Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

133. A preliminary injunction would hold the parties' legal positions in place pending resolution of a question on which courts have divided, rather than permit criminal liability to attach to a federally designated exchange while that question remains open. The Eighth Circuit is currently hearing an appeal that raises the identical question, with briefing set to conclude on December 6, 2026. *See* Appeal Briefing Schedule Order, *KalshiEX, LLC* v. *Bird*, No. 26-2874 (8th Cir. Sept. 17, 2026). A ruling at this stage "preserve[s] the status quo until the merits of [Novig's] claims can be fully adjudicated." *Minnesota*, 2026 WL 2150211, at *18.

134. Novig accordingly seeks a declaration that the Missouri laws identified above are preempted as applied to event contracts traded on its federally designated contract market, and an injunction restraining their enforcement against Novig.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Novig respectfully requests that this Court enter judgment in Novig's favor and against Defendants as follows:

(i) Issue a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Novig, or any of its affiliates, officers, agents, servants, or employees, Mo. Const. art. III, § 39(g), including §§ 39(g)(1), (6), (10)(a), and (15); any implementing Missouri Gaming Commission regulations; any statutes that would subject Novig to criminal liability or abatement under Mo. Rev. Stat. ch. 572; any statutes that would

impose monetary fines, including but not limited to Mo. Rev. Stat. § 407.020; and any other Missouri law that purports to regulate Novig's listing, trading, or settlement of event contracts on a DCM;

(ii) Award a declaratory judgment that the foregoing provisions of Missouri law, and any rules adopted thereunder, are preempted by federal law and therefore violate the Supremacy Clause of the United States Constitution, insofar as Defendants seek to apply them to prohibit Novig, or any of its affiliates, officers, agents, servants, or employees, from offering customers event contracts traded on a DCM; and

(iii) Grant such further relief as the Court deems just and proper.

Respectfully submitted,

**LEWIS RICE LLC**

Dated: October 16, 2026

By: /s/ Winthrop B. Reed, III

Winthrop B. Reed, III, #42840MO
600 Washington Avenue, Suite 2500
St. Louis, Missouri 63101
Telephone: (314) 444-7617
Facsimile: (314) 612-7617
wreed@lewisrice.com

and

**SULLIVAN & CROMWELL LLP**

Benjamin R. Walker (*pro hac vice forthcoming*)
Ann-Elizabeth Ostrager (*pro hac vice forthcoming*)
John J. Liolos (*pro hac vice forthcoming*)
Jason P. Barnes (*pro hac vice forthcoming*)
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
walkerb@sullcrom.com
ostragerae@sullcrom.com
liolosj@sullcrom.com
barnesjas@sullcrom.com

Rishabh Bhandari (*pro hac vice forthcoming*)
1700 New York Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 956-7500
Fax: (202) 293-6330
bhandarir@sullcrom.com

*Counsel for Plaintiff Ludlow Exchange, LLC d/b/a Novig*