**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

---------------------------------------------------------------x

LUDLOW EXCHANGE, LLC d/b/a NOVIG,

Plaintiff / Counter-Defendant,

- vs. -

CATHERINE L. HANAWAY, in her official capacity as Attorney General of the State of Missouri; MICHAEL A. LEAR, in his official capacity as Executive Director of the Missouri Gaming Commission; and JAN M. ZIMMERMAN, in her official capacity as Chair of the Missouri Gaming Commission,

Defendants / Counter-Plaintiffs.

---------------------------------------------------------------x

Civil Action No. 4:26-cv-1780

**DEMAND FOR JURY TRIAL**

**ANSWER AND COUNTERCLAIMS OF DEFENDANTS**

Defendants Catherine L. Hanaway, Michael A. Lear, and Jan M. Zimmerman, each sued in an official capacity (collectively, "Defendants"), by and through undersigned counsel, state the following as their Answer and Affirmative Defenses to the Complaint for Declaratory and Injunctive Relief ("the Complaint") filed by Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Novig"), and assert the Counterclaims set forth below. Defendants deny each and every allegation of the Complaint not expressly admitted herein. The headings and footnotes in the Complaint are Plaintiff Novig's own characterizations and require no response; to the extent a response is required, Defendants deny them. For their response to the specifically numbered paragraphs of the Complaint, Defendants state as follows:

## INTRODUCTION

1. Novig brings this action to enjoin Defendants from enforcing Missouri's preempted gambling and sports-wagering laws against federally regulated transactions that Congress placed within the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").

**ANSWER**: Paragraph 1 states Novig's characterization of its own action and legal conclusions, to which no response is required. To the extent a response is required, Defendants admit that Novig seeks to enjoin enforcement of Missouri's sports-wagering tax and licensing laws but otherwise deny any remaining contentions in Paragraph 1.

2. Novig, Inc. was founded in 2021 with the goal of providing sports-based event contracts to customers across the United States. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur. To pursue that goal under federal regulation, Novig, Inc. formed Plaintiff Ludlow Exchange, LLC d/b/a Novig as its wholly owned subsidiary on October 14, 2025, for the purpose of operating as a CFTC-regulated Designated Contract Market ("DCM"). Novig pursued and obtained the relevant federal designation in 2026. On June 16, 2026, the CFTC designated Novig as a DCM after conducting the thorough review prescribed by the Commodity Exchange Act (the "CEA" or the "Act"). As a DCM, Novig is subject to the CFTC's 23 "Core Principles," along with the broader CFTC regulatory framework. 7 U.S.C. § 7(d). On August 12,

2026, Novig amended its Rulebook, adding Chapter 14, which focuses on responsible trading standards.[1] Novig offers event contracts to customers located in Missouri.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 and therefore deny them.

3. The event contracts Novig lists are a type of derivative instrument that is extensively regulated under federal law and that can be listed, traded, and settled only on federally registered exchanges. In particular, event contracts are quintessential "swaps" as defined by the CEA and therefore can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the CFTC. Congress granted the CFTC "exclusive jurisdiction" over precisely such transactions, 7 U.S.C. § 2(a)(1)(A). Under the CFTC's supervision, event-contract markets have flourished. These still-growing markets have become a multi-billion-dollar industry as investors, market participants, and the public at large have found event contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks. Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2026 alone.

**ANSWER**: Paragraph 3 states legal conclusions, to which no response is required. To the extent a response is required, Defendants deny that Novig's sports event contracts are "swaps" within the CFTC's exclusive jurisdiction, and lack

---

[1] *See* Ludlow Exchange, LLC, Self-Certification of Rule Amendments Establishing Responsible Trading Standards (Aug. 12, 2026).

knowledge or information sufficient to form a belief as to the truth of the allegations concerning the size and volume of event-contract markets and therefore deny them.

4. On September 17, 2026, Missouri Attorney General Catherine L. Hanaway issued a cease-and-desist letter to Novig, threatening legal action unless Novig ceases offering sports event contracts to Missourians or obtains Missouri Gaming Commission licensure.[2] The letter states that Novig has 30 days, until October 17, 2026, to comply or else Missouri "will pursue available enforcement actions against Novig." In an accompanying press release, Attorney General Hanaway stated that Missouri "will enforce the rules voters approved and protect consumers."[3]

**ANSWER**: Defendants admit that Attorney General Catherine L. Hanaway issued a cease-and-desist letter to Novig on September 17, 2026, affording Novig until October 17, 2026, to comply. To the extent this paragraph quotes or cites from these documents, the letter and press release speak for themselves. To the extent a response is required, Defendants deny the allegations.

5. Novig brings this action to prevent Defendants from bringing this preempted enforcement action against Novig.[4]

---

[2] Letter from Catherine L. Hanaway, Att'y Gen. of Mo., to Ludlow Exchange, LLC d/b/a Novig (Sept. 17, 2026).

[3] Press Release, Mo. Att'y Gen., Missouri Attorney General Hanaway Orders Unlicensed Prediction Markets To Cease And Desist Unlawful Sports Wagering (Sept. 17, 2026), https://ago.mo.gov/missouri-attorney-general-hanaway-orders-unlicensed-prediction-markets-to-cease-and-desist-unlawful-sports-wagering/.

[4] Attorney General Hanaway also sent cease-and-desist letters to Kalshi, Polymarket, Crypto.com, Underdog, and Robinhood. *See* Press Release, *supra* note 3.

**ANSWER**: Paragraph 5 states legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

6. Under Defendants' view, sports event contracts offered to persons in Missouri constitute unlicensed sports wagering under Mo. Const. art. III, § 39(g), and may be offered only through a Missouri Gaming Commission-licensed operator and subject to Missouri's tax and regulatory requirements, irrespective of the CFTC's designation of the exchange or the CFTC's treatment of the contract.

**ANSWER**: Defendants admit that sports event contracts offered to persons in Missouri constitute unlicensed sports wagering under Mo. Const. art. III, § 39(g) and may lawfully be offered only through a Missouri Gaming Commission-licensed operator subject to Missouri tax.

7. The CEA forecloses application of Missouri law in this way. The statute's text, history, and context all show that Congress intended to vest the CFTC with centralized authority over regulated derivatives markets and to ensure nationwide uniformity in those markets. Congress gave the CFTC exclusive jurisdiction over "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). Event contracts comfortably fall within the statutory definition of a swap because they are "contract[s]" that "provide[] for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

**ANSWER**: Paragraph 7 states legal conclusions, to which no response is required, and quotes the Commodity Exchange Act, which speaks for itself. To the extent a response is required, Defendants deny that the Commodity Exchange Act forecloses application of Missouri law to Novig's sports event contracts.

8. Despite the CFTC's exclusive jurisdiction over event contracts, Missouri has stated that it intends to pursue legal action against Novig. But Missouri's threatened enforcement of its laws is preempted. Pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate those transactions. Section 2 of the CEA grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps" that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Novig's event contracts fall squarely within the Act's definition of "swap" because each provides for a payment that depends on the occurrence or nonoccurrence of an event associated with potential financial, economic, or commercial consequences. *Id.* § 1a(47)(A)(ii). And because those swaps are traded on a DCM, they are subject to the CFTC's exclusive jurisdiction. *See id.* § 2(a)(1)(A). The CEA also impliedly preempts Missouri's gambling laws as applied to Novig; the statutory grant of "exclusive jurisdiction" over swaps traded on a DCM evinces Congress's intent to oust states from this field and to be the sole regulator of these transactions. *Id.* § 2(a)(1)(A).

**ANSWER**: Paragraph 8 states legal conclusions, to which no response is required. To the extent a response is required, Defendants deny that the Commodity Exchange Act forecloses application of Missouri law to Novig's sports event contracts.

9. Congress's preemptive intent is expressed in the statutory text. When it created the CFTC in 1974, Congress deleted the provision of the Act that had, until then, preserved "any State law applicable" to futures trading, doing so, as its floor sponsor explained, "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis). The conference report stated that the amendments would "preempt the field insofar as futures regulation is concerned" and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.). Indeed, when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "[e]xcept as *hereinabove* provided" in the grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

**ANSWER**: Paragraph 9 states legal conclusions, to which no response is required. The allegations of Paragraph 9 purport to describe statutory text and legislative history, which speak for themselves. To the extent a response is required, Defendants deny that the Commodity Exchange Act forecloses application of Missouri law to Novig's sports event contracts.

10. Novig thus seeks declaratory and injunctive relief under the Declaratory Judgment Act and the Constitution. *See* 28 U.S.C. §§ 1651, 2201, 2202. Federal law preempts Missouri law, and this Court has the equitable power to enjoin Defendants from enforcing preempted state gambling laws. *See Ex parte Young*, 209 U.S. 123,

156–60 (1908). Given Missouri's stated view and threatened enforcement, Novig must either risk exposing the company to significant civil and criminal liability or refrain from offering event contracts to Missouri residents altogether. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citation omitted).

**ANSWER**: Paragraph 10 states legal conclusions, to which no response is required, and purport to describe statutory text and case law, which speak for themselves. To the extent a response is required, Defendants deny the allegations.

11. Absent this Court's relief, Novig will incur irreparable harm. If Novig continues to offer event contracts to its users in Missouri, Defendants may bring an enforcement action premised on the view that Novig is violating Missouri sports-wagering laws, potentially exposing Novig to criminal liability under Chapter 572 of the Missouri Revised Statutes; civil monetary penalties under the Merchandising Practices Act, Mo. Rev. Stat. § 407.020; and abatement remedies under Mo. Rev. Stat. § 572.090. Exposure of that magnitude is substantial, and Missouri's sovereign immunity would place it beyond recovery even after litigation exposes the fatal flaws in Defendants' legal position. These irreparable harms warrant equitable relief. Novig also easily clears the other bars for seeking a preliminary injunction. Both the balance of the equities and the public-interest considerations support this Court's intervention in Novig's favor.

**ANSWER**: The allegations of Paragraph 11 state legal conclusions regarding preemption and irreparable harm, to which no response is required. Defendants admit that Novig may be subject to enforcement under Chapter 572 of the Missouri Revised Statutes, the Missouri Merchandising Practices Act, and Mo. Rev. Stat. § 572.090, and deny that the cited laws are preempted. To the extent further response to Paragraph 11 is required, Defendants deny the allegations that Novig is entitled to the relief it requests.

## PARTIES

12. Plaintiff Novig is a limited liability company organized under the laws of the State of Delaware. Novig was formed on October 14, 2025, and is in good standing under Delaware law. Novig is headquartered in New York, New York, and its principal place of business is 169 Madison Avenue, Suite 2199, New York, NY 10016. Novig was organized for the purpose of operating as a DCM regulated by the CFTC, and it conducts no other business.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 concerning Novig's state of organization, formation date, headquarters, and corporate purpose, and therefore deny them.

13. Novig filed its application for designation as a contract market with the CFTC on December 16, 2025. The CFTC has designated Novig as a DCM under Section 7 of the Commodity Exchange Act, 7 U.S.C. § 7. The CFTC granted that designation on or about June 16, 2026, finding that Novig's application and demonstrations established its ability to comply with the Act and the CFTC's

regulations applicable to DCMs. The CFTC approved the application subject to the conditions that Novig comply with all representations and submissions made in support of it, that Novig comply with all provisions of the Act and the CFTC's regulations applicable to designated contract markets, and that Novig permit no futures commission merchant to intermediate transactions or carry customer accounts unless the Order of Designation is amended. *See* In the Matter of the Application of Ludlow Exchange, LLC for Designation as a Contract Market, Order of Designation (CFTC June 16, 2026).

**ANSWER**: The cited Order of Designation speaks for itself. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 13 and therefore deny them.

14. On August 12, 2026, Novig amended its Rulebook, adding Chapter 14, which outlines Novig's responsible trading commitments. Chapter 14 clearly articulates how Novig protects traders. Only participants at least 21 years of age may trade. Participants may set binding daily, weekly, or monthly limits on their own trading and deposits, and may freeze trading on their accounts for periods ranging from one day to one year. Novig enforces those elections through third-party identity screening, so that a participant cannot open a second account to evade a limit set by the participant, and Novig participates in an industry-wide program allowing participants to engage in an exclusion across multiple prediction-market platforms. Novig also screens for prohibited traders, identifying participants who attempt to transact in markets where they hold undue influence over the outcome or have access

to material non-public information. Novig further invests significant resources in training its employees and increasing public awareness on the importance of maintaining responsible trading best practices.[5]

**<u>ANSWER</u>**: The allegations of Paragraph 14 purport to describe Novig's August 12, 2026 rule certification, which speaks for itself. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14 and therefore deny them.

15. The event contracts at issue in this action are listed, traded, and settled on Novig's federally regulated DCM. Novig's trading model is non-intermediated: contracts trade on an anonymous electronic central limit order book, are cleared on a fully collateralized basis by a derivatives clearing organization, and no futures commission merchant may intermediate any transaction or carry any customer account.

**<u>ANSWER</u>**: Paragraph 15 states legal conclusions regarding Novig's status as a federally regulated exchange, to which no response is required. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Novig's trading, clearing, and settlement mechanics and therefore deny them.

16. Defendant Catherine L. Hanaway is the Attorney General of the State of Missouri and is sued in her official capacity. The Attorney General is the State's

---

[5] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

chief legal officer and has authority to enforce Missouri's sports-wagering laws. The Attorney General sent the September 17, 2026, cease-and-desist letter to Novig.

**ANSWER**: Admitted.

17. Defendant Michael A. Lear is the Executive Director of the Missouri Gaming Commission and is sued in his official capacity. The Missouri Gaming Commission administers Missouri's regulated sports-wagering market under Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. § 313.004, including licensing and regulation of sports-wagering operators.

**ANSWER**: Admitted.

18. Defendant Jan M. Zimmerman is the Chair of the Missouri Gaming Commission and is sued in her official capacity. The Missouri Gaming Commission administers Missouri's regulated sports-wagering market under Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. § 313.004, including licensing and regulation of sports-wagering operators.

**ANSWER**: Admitted.

19. Together, Defendants are responsible for enforcing any demand that Novig comply with the Missouri sports-wagering and gambling laws that are preempted as applied to event contracts traded on a federally designated contract market.

**ANSWER**: Defendants admit that they are responsible for enforcing Missouri's sports-wagering and gambling tax and licensing laws. Defendants deny

that those laws are preempted as applied to Novig and deny the remaining legal conclusions of Paragraph 19.

20. Defendants have threatened to exercise that enforcement authority against Novig if, within 30 days from September 17, 2026, Novig does not (i) cease and desist from offering sports event contracts in Missouri or (ii) obtain a license from the Missouri Gaming Commission and pay all associated state taxes and fees.

**ANSWER**: Paragraph 20 cites a cease-and-desist letter, which speaks for itself. Defendants admit that the Attorney General's letter demanded that Novig, within 30 days, either cease offering sports event contracts in Missouri or obtain a Missouri Gaming Commission license and pay the associated taxes and fees.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, preempts Missouri's sports-wagering and gambling laws insofar as they purport to regulate transactions on a CFTC-designated contract market.

**ANSWER**: Defendants deny that this Court has jurisdiction over Novig's claims as this suit is barred by the Tax Injunction Act, 28 U.S.C. § 1341, and comity.

22. The Court may award injunctive relief under 28 U.S.C. § 1651 and may award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

**ANSWER**: Paragraph 22 states legal conclusions, which require no response. To the extent a response is required, the allegations of Paragraph 22 are denied.

23. The Eleventh Amendment does not bar this action. Novig sues only state officials, in their official capacities, and names no state agency as a defendant. "[A] state official . . . is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc.* v. *Stewart*, 563 U.S. 247, 255 (2011). Under *Ex parte Young*, a plaintiff may sue Missouri officials in their official capacities for prospective declaratory and injunctive relief to stop the threatened enforcement of state law that violates federal law. *Ex parte Young*, 209 U.S. at 156; *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002); *accord St. Paul Area Chamber of Com.* v. *Gaertner*, 439 F.3d 481, 488 (8th Cir. 2006) (citation omitted) ("[W]e encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power."). Novig seeks precisely that relief here.

**<u>ANSWER</u>**: Paragraph 23 states legal conclusions, to which no response is required. The allegations of Paragraph 23 purport to describe Constitutional provisions and case law, which speak for themselves. To the extent a response is required, the allegations of Paragraph 23 are denied.

24. This Court has personal jurisdiction over Defendants. Defendants are domiciled in Missouri and perform their official duties in Missouri.

**<u>ANSWER</u>**: Defendants admit that they are domiciled in Missouri and perform their official duties in Missouri. The other allegations in paragraph 24 state legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations.

25. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in Missouri and a substantial part of the events giving rise to Novig's claim occurred in this District. Novig offers event contracts to Missouri residents located in this District and any state enforcement actions would be directed at conduct occurring in this District.

**ANSWER**: Defendants admit that venue is proper in this District.

## FACTUAL ALLEGATIONS

### A. Event Contracts Are Derivative Instruments That Allow Market Participants To Hedge Risk And Generate Real-Time Information About Consequential Events.

26. This action concerns derivatives. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The CEA defines the "commodities" that may serve as underliers in sweeping terms so that they cover not only physical goods such as wheat, oil, and gold, but also intangibles such as financial indices, interest rates, and the occurrence or nonoccurrence of an event carrying financial, commercial, or economic significance. *See* 7 U.S.C. § 1a(9), (19).

**ANSWER**: The allegations of Paragraph 26 purport to describe the nature of derivatives and the Commodity Exchange Act's definitions, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 26.

27. Among the most familiar derivatives is the swap—an arrangement under which two parties exchange payments measured by the value or performance of some underlying reference, whether an interest rate, a commodity price, or a real-

world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n* v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014). Event contracts represent a paradigmatic subspecies of swaps because they allow market participants to take positions on whether a future occurrence will materialize. Most are binary: every "yes" position is matched by a corresponding "no" position, and at expiration the party who read the outcome correctly is paid.

**ANSWER**: Paragraph 27 states legal conclusions regarding the classification of event contracts as swaps and cites judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny that Novig's sports event contracts qualify as swaps.

28. Take a contract on whether the Kansas City Chiefs will win the NFL Super Bowl. Once that question resolves (whether the Chiefs win the Super Bowl), the contract expires and settles accordingly. The side representing the occurrence (*i.e.*, "the Chiefs win") receives the contract payout, while the side representing the nonoccurrence (*i.e.*, "the Chiefs do not win") receives nothing. The event contract settles with one side receiving $1 and the other side $0; the specified contingency either occurs or does not occur.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28 describing a hypothetical contract and therefore deny them.

29. These contracts can also, importantly, be traded in the market at any point before the event contract expires. Thus, the contract's price will fluctuate as

market participants trade in and out of positions, reflecting the market's real-time views regarding the probability of the underlying future event based on, among other things, new data.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29 and therefore deny them.

30. Take an example from the 2026 NBA Finals. In Game 4 of the 2026 NBA Finals, the Knicks entered as favorites on prediction markets. As the Spurs built a commanding lead in the game, the markets flipped, and by the start of the fourth quarter, with the Spurs up 95 to 75, the Spurs were priced at around a 99 percent probability of winning the game. Then the Knicks rallied. OG Anunoby tipped in a missed Jalen Brunson three-pointer with 1.2 seconds remaining to complete a record 29-point comeback and a 107 to 106 win, and all the while the markets repriced accordingly. That real-time repricing is the mechanism by which event-contract trading aggregates dispersed information about the probability of the underlying outcome.[6]

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 and therefore deny them.

31. Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's future earnings—event contracts likewise

---

[6] *Knicks Championship Odds Swing from 62 to 38 to 82 Percent in Game 4 Thriller*, RealGM (June 11, 2026), https://basketball.realgm.com/wiretap/286022/Knicks-Championship-Odds-Swing-From-62-To-38-To-82-Percent-In-Game-4-Thriller.

reflect the market's up-to-date prediction of the probability that a particular event will transpire.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31 and therefore deny them.

32. Event contracts, like many financial instruments, serve multiple important financial functions. Event contracts can be a form of investment, and they can also serve as a device for mitigating risk for market participants who are already exposed in other ways to the consequences of the underlying event.[7] Sporting outcomes in particular carry economic weight for a wide range of participants. That is unsurprising given that sports are a multi-billion-dollar industry that ripples across the broader economy. Advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and state-licensed sportsbooks all have financial exposure that turns on how games end. Sports-related event contracts let those parties manage that exposure.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 32 and therefore deny them.

33. Several examples neatly illustrate this principle. A regional sponsor whose marketing spend is tied to a team's postseason run can offset the risk of an early exit by purchasing event contracts against the team's championship odds. A hotel whose occupancy depends on whether the local team hosts a home playoff game

[7] Andrew Ross Sorkin et al., *Hedging, Not Betting, on Sports via Prediction Markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

can protect against that exposure by taking a position against the team's seeding. A broadcaster whose ad revenue turns on ratings for a marquee matchup can hedge the risk that a star player is unavailable by purchasing contracts against that player's participation. A state-licensed sportsbook, whose book concentrates exposure to a particular outcome by design, can offset that exposure on an exchange rather than absorbing it alone. Sports event contracts, in other words, allow market participants to isolate and efficiently price the risk of a single economically consequential occurrence.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 33 and therefore deny them.

34. Beyond hedging, these markets generate valuable information, often in real time. Market participants often research the underlying event's probability before taking a position; thus, their trades may provide valuable information to the public. The depth and breadth of participation also improve the quality of information. Liquidity is therefore critical to price discovery because it allows market participants to move in and out of their positions efficiently. The public benefits from the wisdom of the crowd if the event contract's market is liquid and includes the most well-informed traders.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34 and therefore deny them.

35. Congress also recognized the twin roles that derivatives play in the national economy by declaring that derivative transactions "are affected with a

national public interest by providing" both a means of hedging risk and a mechanism for "disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

**<u>ANSWER</u>**: The allegations of Paragraph 35 purport to describe and quote 7 U.S.C. § 5(a), which speaks for itself. To the extent a response is required, Defendants deny the allegations of Paragraph 35.

**B. Congress Granted The CFTC Exclusive Jurisdiction Over Derivatives Traded On Federally Designated Exchanges, Including Swaps.**

36. Federal supervision of derivatives spans more than a century. Before 1922, these instruments commanded little judicial respect. One court dismissed futures trading as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and the Supreme Court described futures contracts as "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508–09 (1884). Numerous states passed laws to suppress or restrict futures trading of commodities.

**<u>ANSWER</u>**: The allegations of Paragraph 36 purport to describe statutory and judicial history, which speak for themselves. Defendants otherwise deny the allegations in Paragraph 36.

37. That view did not hold. Over time, as markets matured and the economic value of derivatives became more apparent, courts and commentators came to recognize these instruments as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905). Congress followed suit by first centralizing futures trading on federally approved contract markets in the Grain

Futures Act of 1922, ch. 369, 42 Stat. 998, 1000–02 (1922) ("Grain Futures Act"), and then broadening federal supervision of derivatives exchanges in the CEA 14 years later, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

**ANSWER**: The allegations of Paragraph 37 purport to describe judicial authority and statutory history, which speak for themselves. Defendants otherwise deny the allegations in Paragraph 37.

38. As first enacted, the CEA left "any State law applicable" to covered transactions undisturbed. *Id.* That changed in 1974. Congress created the CFTC to administer the statute and vested it with "exclusive jurisdiction" over transactions in derivatives listed and traded on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A).

**ANSWER**: The allegations of Paragraph 38 purport to describe the Commodity Exchange Act and its 1974 amendments, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

39. Congress left no doubt about what it was doing. Alongside the grant of exclusive jurisdiction, it struck the clause that had preserved "any State law applicable" to futures trading. *See* H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.); 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete"). When the House floated language that would have let state law reach CEA-regulated transactions, the Senate accepted only after amending the provision to clarify that it applied "[e]xcept as hereinabove provided"—that is, subject to the exclusive-jurisdiction grant. *See*

7 U.S.C. § 2(a)(1)(A); S. Rep. No. 93-1131, at 31 (1974). Preemption was a central goal of this legislation. As one commentator put it, "preemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).

**ANSWER**: The allegations of Paragraph 39 purport to describe statutory text and legislative history, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

40. The concern driving that choice was practical. Congress recognized the obvious point that a national market cannot function under fifty regulators. As one Senator put it, regulation under "different State laws would just lead to total chaos." Commodity Futures Trading Commission Act Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113*, Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark). The House Committee on Agriculture sought to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The conference report was explicit that the amendments would "*preempt the field* insofar as futures regulation is concerned," and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.) (emphasis added).

**ANSWER**: The allegations of Paragraph 40 purport to describe legislative history, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

41. Congress simultaneously widened the statutory definition of "commodity" to encompass "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The purpose was to capture "futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974).

**ANSWER**: The allegations of Paragraph 41 purport to describe statutory text and legislative history, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

42. In 2010, Congress further broadened the CFTC's exclusive jurisdiction to cover swaps. The CFTC's exclusive jurisdiction now reaches "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures," and supplied an "explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3, 13 (2019).

**ANSWER**: The allegations of Paragraph 41 purport to describe statutory text and commentary, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

43. This statutory history extends in one direction. Congress has legislated three times in this area, and each time, it has decided to enlarge the federal role such that it has become "abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 44–45 (1974).

**ANSWER**: Paragraph 43 states legal conclusions and quotes legislative history, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

44. The definition of "swap" is correspondingly broad, covering any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Courts in this Circuit have taken that language at face value, observing that "[t]he CEA's definition of 'swap' is broad, a description that flows from the relevant terms Congress used in § 1a(47)(A)(ii)." *United States* v. *Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026) (citing *United States* v. *Phillips*, 155 F.4th 102, 113 (2d Cir. 2025)); *see KalshiEx, LLC* v. *Bird*, 2026 WL 2691009, at *10 (S.D. Iowa Sept. 8, 2026) ("Granted … the definition of 'swap' in 7 U.S.C. § 1a(47)(a)(ii) refers broadly to '*potential* financial, economic, or commercial consequence[s]'"). After all, Congress wrote the

definition to capture instruments that "in the future become[] commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv).

**ANSWER**: The allegations of Paragraph 44 purport to describe statutory text and judicial authority, which speak for themselves. No response is required; to the extent a response is required, Defendants deny that Novig's sports event contracts fall within the statutory definition of a "swap."

45. In its October 9, 2026 Notice of Proposed Rulemaking, the CFTC—pursuant to its expressly delegated authority under the CEA—defines a "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." *Further Definition of "Swap" – Inclusions* 1, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58. The CFTC adopted this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.* at 11. As part of its justification, the CFTC discussed the potential economic consequences associated with sports events, such as: increased ticketing revenue and franchise valuation that can accompany postseason success; enhanced viewership during a close game; player contractual bonuses tied to statistical results; and promotions that link the outcome of a sporting event to a financial consequence for a business (*e.g.*, a furniture store in Houston that runs a promotion in which customers who spend a minimum amount receive refunds if the Houston Astros win the World Series). *Id.* at 24–26.

**ANSWER**: The allegations of Paragraph 45 purport to describe the CFTC's October 9, 2026 Notice of Proposed Rulemaking, which speaks for itself. No response

is required; to the extent a response is required, Defendants deny the allegations of Paragraph 45.

46. Two narrow carveouts accompany the grant of exclusive jurisdiction, and neither is implicated here. One preserves the authority of the Securities and Exchange Commission and other federal agencies over instruments within their statutory mandate. *See* 7 U.S.C. § 2(a)(1). The other leaves the states room to apply generally applicable laws to off-exchange transactions—those not conducted on a DCM—and to unregistered entities. *Id.* § 16(e)(1); *see* H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (States may regulate "transactions outside those preserved exclusively for the jurisdiction of the CFTC").

**ANSWER**: The allegations of Paragraph 46 purport to describe 7 U.S.C. §§ 2(a)(1) and 16(e)(1) and legislative history, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 46.

47. Novig is registered as a DCM, and its contracts trade on an exchange. It is a contract market designated by the CFTC, and the transactions at issue occur on that market. The off-exchange carveout therefore has no application, and no other federal agency claims these instruments.

**ANSWER**: Paragraph 47 states legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 47.

### C. The CFTC Comprehensively Regulates Designated Contract Markets And The Event Contracts They List.

48. Derivatives may be offered to the public only on a CFTC-approved DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

**ANSWER**: The allegations of Paragraph 48 purport to describe 7 U.S.C. §§ 2(e) and 7(a) and 17 C.F.R. § 38.3(a), which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

49. Such approval does not come easy. An applicant must document its compliance with the 23 Core Principles set forth in the CEA. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a)(2). An applicant must also show that it will observe the Commission's rules; that it will adopt, monitor, and enforce its own rules; that the contracts it lists are not readily susceptible to manipulation; that it has both the capability and the obligation to detect and prevent manipulation, price distortion, and disruption through surveillance, compliance, and enforcement; and that it will impose position limits to constrain manipulation risk. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

**ANSWER**: The allegations of Paragraph 49 purport to describe the Commodity Exchange Act's Core Principles and the CFTC's regulations, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

50. The obligations do not end at designation. A DCM must assume "a duty of self-regulation, subject to the Commission's oversight," and also is required to

"enact and enforce rules to ensure fair and orderly trading." *Am. Agric. Movement, Inc.* v. *Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1150–51 (7th Cir. 1992). A slew of other CFTC regulations govern in painstaking detail various other parts of the entity's operations, from recordkeeping and daily market-data reporting to the public disclosure of certain contract terms and rules and other requirements relating to liquidity, dispute resolution, governance, and auditing. To give one illustrative example, a DCM must extend "impartial access to its markets and services" to every person holding trading privileges. 17 C.F.R. § 38.151(b). An entity may lose its designation if it is found in noncompliance with these regulations.

**ANSWER**: The allegations of Paragraph 50 purport to describe regulatory text and case law, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

51. A DCM has two routes to listing a new contract. It may certify in writing, no later than the business day preceding listing, that the contract conforms to the CEA and the CFTC's rules, 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a); or it may seek the CFTC's approval beforehand, 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). Under the latter route, the CFTC must "approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or its regulations. 7 U.S.C. § 7a-2(c)(5)(B).

**ANSWER**: The allegations of Paragraph 51 purport to describe statutory and regulatory text, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

52. An entity cannot avoid oversight through certification. The Commission has a 10-day window to "stay[] the certification" for additional review. 7 U.S.C. § 7a-2(c)(3). If the Commission does not act within this period, the new contract is deemed approved. *Id.* § 7a-2(c)(2).

**ANSWER**: Paragraph 52 states legal conclusions and purports to describe statutory text, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

53. Congress also legislated specifically with respect to event contracts. Under the special rule adopted in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), the CFTC may find an event contract "contrary to the public interest" where it "involves" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i) (the "Special Rule"). The CFTC has long taken the position that the Special Rule operates as a "discretionary review framework rather than a self-executing per se prohibition" and that the Special Rule "does not authorize the CFTC to impose a per se prohibition" on the listing of such event contracts independent of a public interest determination. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,811, 35,813, 35,815 (proposed June 12, 2026); *see* 17 C.F.R. § 40.11(a)(1)–(2).

**ANSWER**: Paragraph 53 states legal conclusions and purports to describe 7 U.S.C. § 7a-2(c)(5)(C) and the CFTC's stated positions, which speak for themselves.

No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

54. Two consequences follow from Congress's decision to give the Commission such authority. The first is that event contracts touching on gaming—which include sports-based event contracts—are within the Commission's exclusive jurisdiction. A grant of power to review them presupposes as much. The second is that Congress opted for a regime of individualized, contract-by-contract analysis rather than the use of categorical, blanket prohibitions.

**ANSWER**: Paragraph 54 states legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 54.

55. The CFTC is drafting an amendment to the Special Rule regarding whether sports-related event contracts are "consistent with the public interest." *See* 91 Fed. Reg. at 35,836. The CFTC expects this amended Special Rule to become final by the end of November. *See* Resp. to Mot. for Summ. Disposition at 2, *U.S. Commodity Futures Trading Comm'n* v. *Johnson*, No. 26-4281 (9th Cir. filed Sept. 24, 2026), Dkt. No. 29.1 (noting that the CFTC expected the revised version of the Special Rule to become final within the next two months).

**ANSWER**: The allegations of Paragraph 55 purport to describe CFTC rulemaking activity and a filing in another case, which speak for themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

56. The CFTC is also equipped with the full panoply of tools necessary to conduct this analysis and ensure regulatory compliance across the industry. The CFTC has the authority to bring actions in federal court or before administrative tribunals, and it is empowered to seek a range of remedies, including civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and suspension, denial, revocation, or restriction of registration and trading privileges. The CFTC may also refer matters to the Department of Justice or state authorities if it finds evidence of criminal conduct. CFTC, Div. of Enf't, Enforcement Manual § 3.3 (2020).

**ANSWER**: The allegations of Paragraph 56 state legal conclusions, to which no response is required, and purport to describe the CFTC's enforcement authority and the cited Enforcement Manual, which speak for themselves. To the extent a response is required, Defendants deny the allegations of Paragraph 56.

57. In sum, federal law reaches every stage of an event-contract transaction. The CFTC prescribes the procedures by which a contract may be listed and retains authority to review, stay, and prohibit it; designates and supervises the exchange that lists it; and polices the trading that follows.

**ANSWER**: Paragraph 57 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 57.

### D. Novig Sought To Operate Under State Licensing Regimes, Found Them Structurally Incompatible With An Exchange, And Obtained Federal Designation.

58. Novig, Inc.'s founders were familiar with prediction markets from the company's earliest days and came to view that model as the better fit for Novig's product. Novig, Inc. did not initially pursue federal designation because, in the regulatory environment then prevailing, it anticipated that federal approval could take years and offered no assurance that sports-related event contracts would be permitted. Novig, Inc. therefore first pursued state-by-state licensing, securing a Colorado license in October 2023, before returning that license in April 2024 and later pursuing a federally regulated prediction-market model.

**ANSWER**: The allegations of Paragraph 58 purport to describe Novig's regulatory history and cited records, which speak for themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

59. Novig, Inc. was founded in 2021 by Jacob Fortinsky and Kelechi Ukah and was incorporated in Delaware on March 3, 2021.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 59 and therefore deny them.

60. Novig, Inc.'s founders conceived the company after observing that established sportsbooks routinely limited or banned customers who won too often, treating a successful bettor, in the words of its chief executive, "the same way a casino treats a card counter." The company sought to eliminate that practice. Its exchange structure removes what the company describes as "unfair odds and punitive limits on

winning traders," and produces prices driven by real-time supply and demand rather than by bookmaker discretion.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 60 and therefore deny them.

61. Indeed, the Novig name is a homage to the key distinctions between event-contract platforms and sportsbooks. Traditional sportsbooks make money by adjusting the odds so that they include a commission for the sportsbook to cover the costs of facilitating the wager. This commission is called "vigorish" or "vig" in the language of sportsbooks. The Novig name reflects a business model in which the company does not charge a "vig."[8]

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61 and therefore deny them.

62. Novig, Inc. did not begin by seeking federal designation. It first attempted to operate within precisely the state licensing framework that Defendants now seek to enforce against Novig. On September 21, 2023, the State of Colorado Department of Revenue, Division of Gaming approved an Internet Sports Betting Operator license for Novig Laboratories, LLC d/b/a Novig, and the company launched its product in that State in October 2023.

**ANSWER**: Defendants admit, on information and belief, that the State of Colorado issued Novig or its affiliate an internet sports betting operator license and

[8] *See* Novig, "Exchange vs Sportsbook," https://novig.com/blog/exchange-vs-sportsbook (Oct. 9, 2026).

that Novig launched a sports-wagering product in Colorado in 2023. The cited records speak for themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 62 and therefore deny them.

63. Colorado's regulations recognized exchange wagering as a form of sports wagering, defining "exchange wagers" as "a form of wagering in which two or more persons place identically opposing wagers in a given market, allowing patrons to wager on both winning and non-winning outcomes in the same event." 1 Colo. Code Regs. § 207-2:1.4(8). Yet in 2023 Colorado declined to adopt proposed rules for exchange wagering. Novig, Inc. sought their adoption through the process the State provided. It participated in at least two stakeholder meetings, and on December 13, 2023 formally requested that Colorado "prioritize the passage of exchange wagering regulations," stating that it was "fully prepared to comply with any additional regulations or guidelines" the State might set. The company thereafter proposed a modified feature and met with the Division of Gaming to explain this feature. On February 9, 2024, the Division determined that the proposed feature would constitute exchange wagering and advised the company to "wait until appropriate proposed rules are not only voted on by [Colorado] but, if applicable, go into effect."

**ANSWER**: The allegations of Paragraph 63 purport to describe Colorado regulations and Novig's communications with Colorado regulators, which speak for themselves. To the extent a response is required, Defendants deny the allegations of Paragraph 63.

64. That effort demonstrated why a state-by-state licensing model is structurally incompatible with an event-contract exchange. The traditional framework was designed for sportsbooks—operators that act as counterparties to every wager, set their own prices, and earn revenue from the spread between those prices and true probability. An exchange earns no vig and takes no position. It depends instead on liquidity: a trade can occur only if a buyer and a seller can be matched at the same price. Confining an exchange's participants within a single state's borders deprives it of the counterparties that make the market function at all. Novig, Inc. encountered further difficulty with other state regulators. Regulators are often incentivized to protect incumbent operators over a lower-margin product like Novig's that would reduce state tax revenue. A licensing regime calibrated to the economics of the house does not readily accommodate a market with no house.

**<u>ANSWER</u>**: Paragraph 64 states arguments and legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64 and therefore deny them.

65. In April 2024, Novig, Inc. withdrew from the Colorado market. It thereafter remitted unpaid patron funds to the Colorado Treasury and, in March 2025, submitted its request to surrender the license and withdraw its associated persons, which the Division of Gaming confirmed it would process.

**<u>ANSWER</u>**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 65 and therefore deny them.

66. Novig, Inc. formed Plaintiff Ludlow Exchange LLC d/b/a Novig, or "Novig," on October 14, 2025 to pursue a federally regulated prediction market model. Novig applied to the CFTC for designation as a contract market pursuant to Section 5(a) of the CEA, 7 U.S.C. § 7(a), and Commission regulation 38.3(a), 17 C.F.R. § 38.3(a). Novig's application comprised submissions dated January 1, 2026 through June 10, 2026, and included Novig's Certificate of Formation, its Amended and Restated Operating Agreement, its Certificate of Good Standing, its Rulebook, and a narrative demonstrating Novig's compliance with each of the core principles applicable to designated contract markets.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 66 and therefore deny them.

67. On June 16, 2026, the CFTC granted that designation, placing Novig within the same regulatory architecture that governs futures and derivatives exchanges generally. Commission staff reviewed Novig's application, including its rules and the representations Novig made, and conducted a technical evaluation of Novig's operational capabilities to evaluate its compliance with the core principles and corresponding Commission regulations applicable to DCMs under Section 5(d) of the Act, 7 U.S.C. § 7(d), and Commission regulations 17 C.F.R. §§ 38.100–38.1201. The Commission found that Novig's application and demonstrations established its ability to comply with the Act and the Commission's regulations applicable to DCMs, and provided sufficient assurance that Novig would continue to comply.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 67 and therefore deny them.

68. Novig is therefore not an intermediary that routes customer orders to an exchange operated by another entity. Novig is itself the federally regulated exchange. Every contract at issue in this action is listed, traded, and settled on a contract market designated by the CFTC under Section 7 of the CEA. Novig is responsible for ensuring compliant surveillance, using systems and tools that monitor Exchange activity in real time and on a trade-date-plus-one basis, and for enforcing its trading rules. Novig is likewise responsible for compliant regulatory reporting and recordkeeping, investigations, disciplinary actions, and establishing rules to resolve disputes involving its market participants.

**ANSWER**: Paragraph 68 states legal conclusions regarding Novig's status to which no response is required. To the extent a response is required, Defendants deny those conclusions. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Novig's operations or legal compliance and therefore deny them.

69. Consistent with the seriousness in which Novig takes its obligations, on August 12, 2026, Novig submitted to the CFTC a rule certification adding a new chapter to its Rulebook on "Responsible Trading Standards."[9] The new rules establish binding standards governing, among other things, participant education,

[9] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

marketing, platform design, participant controls, incentive programs, contract review, monitoring and intervention, and age and eligibility requirements. Among other protections, the rules require risk disclosures before trading, tools allowing participants to set limits and cooling-off periods, restrictions on promotional practices that could encourage loss-chasing, monitoring for potentially concerning trading activity, and a minimum trading age of twenty-one.

**ANSWER**: Paragraph 69 states legal conclusions regarding Novig's status to which no response is required. To the extent a response is required, Defendants deny the allegations stated therein. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore deny them.

70. Novig's designation reflects a federal judgment about how these instruments are to be regulated. The CFTC does not regulate casinos or sportsbooks; it regulates markets. In designating Novig, the CFTC found that Novig complied with the statutory and regulatory requirements governing federally designated derivatives markets—the same determination that subjects Novig to comprehensive federal oversight, and the same determination that Defendants' threatened enforcement would nullify.

**ANSWER**: Paragraph 70 states legal conclusions regarding Novig's status to which no response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 70.

71. Novig's regulatory history is thus the opposite of evasion. Novig, Inc. sought a state license, obtained one, and complied with it. It relinquished that license

only after concluding that the state framework could not accommodate an exchange model, and it thereafter obtained federal designation through the process Congress established for exactly this category of instrument. Defendants now seek to apply to Novig the very state licensing regime that the company tested, found structurally unworkable for an exchange, and lawfully exited.

**ANSWER**: Paragraph 71 states arguments and legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 71.

### E. Missouri Has Threatened To Enforce Its Sports-Wagering Laws Against Novig.

72. Missouri's constitution has long prohibited gambling under Mo. Const. art. III, § 39. On November 5, 2024, Missouri voters approved Amendment 2, authorizing a regulated sports-wagering market administered by the Missouri Gaming Commission under Mo. Const. art. III, § 39(g). The Missouri Attorney General's September 17 letter describes that framework as requiring online sports-wagering platforms serving Missourians to obtain licensure and comply with related tax and fee requirements.

**ANSWER**: Admitted.

73. Missouri Amendment 2 makes it unlawful to offer online sports wagering to Missourians without a Missouri Gaming Commission license. The framework imposes a 10% wagering tax on adjusted gross revenue, Mo. Const. art. III, § 39(g)(10)(a), and license fees of up to $500,000, *id.* § 39(g)(6).

**ANSWER**: Admitted.

74. Missouri's statutory regime imposes criminal liability for offering online sports wagering without a license. "[A] person engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome." Mo. Rev. Stat. § 572.010(4). Missouri prohibits "possession of a gambling device," which refers to "manufactur[ing], sell[ing], transport[ing], plac[ing] or possess[ing], or conduct[ing] or negotiat[ing] any transaction affecting or designed to affect ownership, custody or use of" a "gambling device . . . used in the state of Missouri in the advancement of unlawful gambling activity." Mo. Rev. Stat. § 572.070(2). The state also prohibits promoting gambling, which is defined as "knowingly advanc[ing] or profit[ing] from unlawful gambling or lottery activity by . . . operating a gambling device to the extent that more than one hundred dollars of money is gambled upon . . . in any one day." Mo. Rev. Stat. § 572.030(1). Illegal promotion of gambling is a class E felony. *Id.* A gambling device is "any device, machine, paraphernalia or equipment that is used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person with a machine." Mo. Rev. Stat. § 572.010(5).

**ANSWER**: Admitted.

75. Missouri's Attorney General can also seek monetary fines. The state's Merchandising Practices Act prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or

omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020. An "unfair practice" is one that "[o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state" and "[p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. Ann. tit. 15, § 60-8.020.

**ANSWER**: Admitted.

76. In addition to seeking criminal and monetary penalties, the Attorney General is authorized to enjoin a "public nuisance," which is defined as a "room, building, or other structure regularly used for any unlawful gambling activity." Mo. Rev. Stat. § 572.090.

**ANSWER**: Admitted.

77. On September 17, 2026, the Missouri Attorney General issued a cease-and-desist letter to Novig. That letter demanded that, by October 17, 2026, Novig cease offering event contracts in Missouri or obtain Gaming Commission licensure and pay state taxes and fees. If Novig does not comply, the letter states that the Missouri Attorney General will take legal action against Novig.

**ANSWER**: Admitted.

78. Any subsequent enforcement action would likely seek injunctive relief and monetary penalties, such as those envisioned in Mo. Rev. Stat. §§ 407.020 and 572.090. Because Mo. Rev. Stat. § 572.030 renders promoting gambling a felony, the Attorney General may also seek criminal penalties. The threat is not theoretical.

Other states have sought civil monetary penalties amounting to billions of dollars and criminal sanction against other DCMs.[10]

**ANSWER**: Defendants admit that the Attorney General can bring enforcement actions under the cited Missouri statutes, which speak for themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning actions by other States and therefore deny them.

79. Compliance with Defendants' demands is not a practical alternative for Novig. Missouri's framework is designed for licensed sportsbook operators, but is structurally incompatible with an event-contract exchange. Licensure would require Novig to confine participants to Missouri and pay Missouri wagering taxes under Mo. Const. art. III, § 39(g)(10)(a). Those requirements would fragment the national liquidity that a CFTC-designated exchange requires, because an event contract can be executed only if a buyer and a seller can be matched at the same price. If Novig were required to make comparable exclusions in every other state that seeks to apply its gambling laws in this manner, each such state would impose comparable geographic limitations. Such geographic partitioning would deprive Novig's markets of the liquidity on which they depend and frustrate the public interest Congress sought to advance in creating a federally regulated national market. Prediction

[10] For instance, New York has pursued civil monetary penalties against Kalshi and Polymarket. *See* Notice of Removal, *New York* v. *KalshiEX LLC*, No. 1:26-cv-06550 (S.D.N.Y. Aug. 7, 2026), Dkt. No. 1; Notice of Removal, *New York* v. *QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. No. 1. Similarly, Arizona's Attorney General filed 20 criminal misdemeanor charges against Kalshi. *See* Information, *State* v. *KalshiEX LLC*, Nos. CR2026-000173-001 & CR2026-000173-002 (Ariz. Super. Ct. Maricopa Cnty. Mar. 16, 2026).

markets aggregate dispersed information most accurately when they are broad, liquid, and open to participants across the country; the wider the pool of informed participants, the more reliably prices track the probability of the underlying event. Carving the market into fifty walled-off state exchanges would thin liquidity, degrade price discovery, and undermine the very informational value Congress recognized in declaring derivatives transactions "affected with a national public interest by providing" a means "for . . . disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Limiting the geographic scope of customers limits the efficacy of the market in ways Congress did not intend.

**ANSWER**: Paragraph 79 states argument and legal conclusions to which no response is required; to the extent a response is required, Defendants admit that Novig has failed to satisfy Missouri's licensure and taxation requirements but otherwise deny the allegations of Paragraph 79.

80. Novig therefore confronts a stark choice: *abandon* the Missouri market, submit to a licensing regime incompatible with its exchange model, or proceed and face the enforcement action Attorney General Hanaway has publicly promised. Novig has no option but to seek judicial relief.

**ANSWER**: Paragraph 80 states argument and legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 80.

## CLAIM FOR RELIEF

### United States Constitution
### (Supremacy Clause—Preemption by the Commodity Exchange Act)
### U.S. Const. art. VI, cl. 2

81. Novig repeats and incorporates by reference each of the allegations set forth above.

**ANSWER**: Defendants incorporate by reference their responses to Paragraphs 1 through 80 as though fully set forth herein.

82. The Supremacy Clause provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Federal law accordingly "is supreme in case of a conflict with state law." *Murphy* v. *NCAA*, 584 U.S. 453, 477 (2018).

**ANSWER**: The allegations of Paragraph 82 purport to describe the Supremacy Clause and quote judicial authority, which speak for themselves. To the extent a response is required, Defendants deny the allegations.

83. "[S]tate laws that 'interfere with, or are contrary to the laws of congress . . .' are invalid." *Wis. Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). A preempted state law is "without effect." *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981); *see Perez* v. *Campbell*, 402 U.S. 637, 652 (1971).

**ANSWER**: The allegations of Paragraph 83 purport to describe and quote judicial authority, which speaks for itself. To the extent a response is required, Defendants deny the allegations.

84. Federal law may preempt state law expressly or by implication. *See Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). In the Eighth Circuit, courts recognize three categories of preemption: express, conflict, and field preemption.

> As relevant here, Congress can preempt state law in one of three ways: (1) expressly through statutory language like a preemption clause; (2) implicitly when a state law "conflict[s] with" or stands as an obstacle to federal law; and (3) implicitly by "occup[ying] a legislative field," leaving no room for state law.

*WinRed, Inc.* v. *Ellison*, 59 F.4th 934, 941 (8th Cir. 2023) (quoting *Weber* v. *Heaney*, 995 F.2d 872, 875 (8th Cir. 1993)).

**ANSWER**: The allegations of Paragraph 84 purport to describe and quote judicial authority, which speaks for itself. To the extent a response is required, Defendants deny the allegations.

85. The "ultimate touchstone" of the inquiry is congressional intent. *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978)).

**ANSWER**: The allegations of Paragraph 85 purport to describe and quote judicial authority, which speaks for itself. To the extent a response is required, Defendants deny the allegations.

86. Under any and all of these frameworks, the Missouri laws Defendants have invoked—or may invoke—are preempted to the extent Defendants seek to

enforce them against Novig for listing, trading, and settling event contracts on a federally designated contract market. Those laws include Mo. Const. art. III, § 39(g), including §§ 39(g)(1), (6), (10)(a), and (15); any implementing Missouri Gaming Commission regulations; and any other Missouri law that purports to regulate Novig's listing, trading, or settlement of event contracts on a designated contract market, which include, but are not limited to, Mo. Rev. Stat. §§ 407.020, 572.030, 572.070, and 572.090.

**ANSWER**: Paragraph 86 states legal conclusions and purports to describe Missouri law, which speaks for itself. No response is required; to the extent a response is required, Defendants deny that Mo. Const. art. III, § 39(g) or Mo. Rev. Stat. §§ 407.020, 572.030, 572.070, and 572.090 are preempted as applied to Novig.

87. The CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A).

**ANSWER**: The allegations of Paragraph 87 purport to describe and quote statutory text, which speaks for itself. To the extent a response is required, Defendants deny the allegations.

88. A "swap" includes any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency

associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

**ANSWER**: The allegations of Paragraph 88 purport to describe and quote statutory text, which speaks for itself. To the extent a response is required, Defendants deny the allegations.

89. The event contracts Novig lists satisfy each element of that definition. Each contract is an agreement providing for payment. Each payment depends on the occurrence, nonoccurrence, or extent of the occurrence of a defined event—the final score, margin, win-loss result, tournament advancement, or statistical performance in a professional or collegiate sporting event. And each such event is associated with potential financial, economic, or commercial consequences.

**ANSWER**: Paragraph 89 states legal conclusions to which no response is required; to the extent a response is required, Defendants deny that Novig's sports event contracts satisfy the statutory definition of a "swap."

90. The statutory definition of "swap" is broad. Congress extended the definition to reach instruments that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), and delegated to the CFTC and the Securities and Exchange Commission the authority to "further define" the term, 15 U.S.C. § 8302(d)(1). Congress did not delegate that task to fifty state gaming regulators.

**ANSWER**: The allegations of Paragraph 90 purport to describe 7 U.S.C. § 1a(47)(A)(iv) and 15 U.S.C. § 8302(d)(1), which speak for themselves. No response

is required; to the extent a response is required, Defendants deny the allegations stated therein.

91. The events underlying Novig's contracts sit at the core of the definition. Professional and collegiate sporting outcomes bear on advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and the institutional investors who hold equity in franchises and media rights. They bear as well on state-licensed sportsbooks, whose exposure to those outcomes is concentrated by design and who could use exchange-traded contracts to hedge.

**ANSWER**: Paragraph 91 states legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations stated therein.

92. The CFTC has reached the same conclusion. Pursuant to the authority provided by Congress, the CFTC published a Notice of Proposed Rulemaking on October 9, 2026 that would define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." *Further Definition of "Swap" – Inclusions* 1, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58. The CFTC adopted this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.* at 11. As part of its justification, the CFTC

highlighted the potential economic consequences associated with sports events. *Id.* at 24–26.[11]

**ANSWER**: The allegations of Paragraph 92 purport to describe the CFTC's October 9, 2026 Notice of Proposed Rulemaking, which speaks for itself. Defendants aver that it is a proposed rule without the force of law and otherwise deny the allegations stated therein.

93. Swap status does not turn on the subject matter of the underlying event. Congress carved out precisely two underliers from the CEA's reach—onions and motion picture box office receipts. 7 U.S.C. § 1a(9). Sporting events are not among them, and the enumeration of two forecloses invention of a third. *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (the express inclusion of one item implies the exclusion of another left unmentioned).

**ANSWER**: The allegations of Paragraph 93 purport to describe statutory text and judicial authority, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

94. Because the event contracts at issue are swaps traded on a contract market designated under Section 7, they fall within the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A).

---

[11] In addition to arguing that sports-related event contracts fall within the second prong of the CEA's definition of "swap," 7 U.S.C. § 1a(47)(A)(ii), the CFTC took the position that sports-related event contracts also fall within the first and fourth prongs, *id.* § 1a(47)(A)(i), (iv). *See Further Definition of "Swap" – Inclusions* 13–27, CFTC RIN 3038-AF82 (Oct. 9, 2026), https://perma.cc/P76K-RJ58.

**ANSWER**: Paragraph 94 states legal conclusions to which no response is required; to the extent a response is required, Defendants deny that Novig's sports event contracts qualify as swaps that fall within the CFTC's exclusive jurisdiction.

95. Congress supplied the preemptive language itself. A grant of "exclusive" jurisdiction excludes others by its terms. The Supreme Court has confirmed that the "plain meaning" of a grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any other body. *Mississippi* v. *Louisiana*, 506 U.S. 73, 77–78 (1992). Where "Congress has made its [preemptive] intent known through explicit statutory language," *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), courts give effect to the statute's "plain meaning," *Cipollone*, 505 U.S. at 521 n.19. Usage at the time of enactment was no different: "exclusive" meant "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," and "exclusive jurisdiction" meant "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive*; *Exclusive Jurisdiction*, *Black's Law Dictionary* (5th ed. 1979).

**ANSWER**: The allegations of Paragraph 95 state legal conclusions, requiring no response, and reference judicial authorities and other materials, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

96. Courts construing § 2(a)(1)(A) have long held that the Act preempts state law regulating futures trading on a federally regulated exchange. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156–57; *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("§ 2(a)(1) of the CEA preempts the application of state law."),

*aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353 (1982); *FTC* v. *Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001); *Kelly* v. *Carr*, 691 F.2d 800, 803 (6th Cir. 1980). The principle has been applied to state gambling law specifically. In *Paine*, *Webber*, *Jackson & Curtis*, *Inc.* v. *Conaway*, the court held the CEA preempted a state gambling statute that would have voided futures contracts, observing that "there unquestionably is a federal interest in whether a state brands commodity transactions as 'gambling' and effectively bars those transactions on federally regulated exchanges." 515 F. Supp. 202, 206 (N.D. Ala. 1981).

**ANSWER**: The allegations of Paragraph 96 purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

97. That principle has now been applied to these precise instruments. *See KalshiEX LLC* v. *Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) ("Here, the Act grants the CFTC exclusive jurisdiction over 'swaps . . . traded or executed on a [DCM],' which include Kalshi's sports-related event contracts." (quoting 7 U.S.C. § 2(a)(1)(A))); *KalshiEX, LLC* v. *Assad*, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) ("We conclude that, based on its plain wording, § 2 preempts state regulation of swaps that are 'traded or executed' on a DCM."); *Minnesota*, 2026 WL 2150211, at *1 ("Plaintiffs have shown that the CEA's grant of exclusive jurisdiction over transactions involving swaps likely preempts across-the-board enforcement of the Minnesota prediction market statute against Kalshi and Polymarket US for a considerable swath of the

event-contract trades they host."); *Coinbase Fin. Mkts.* v. *Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026) ("Congress has given the CFTC exclusive jurisdiction to regulate many of Kalshi's sports-related swap contracts. That choice preempts the control defendants seek to exert over Kalshi."); *but see KalshiEX LLC* v. *Schuler*, 2026 WL 2884087, at *18 (6th Cir. Sept. 25, 2026) (holding that Kalshi's sports-event contracts are not swaps, but even if they were, the CEA does not preempt Ohio's or Tennessee's gambling laws).

**ANSWER**: The allegations of Paragraph 97 state legal conclusions, requiring no response, and purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny that the cited decisions control the question presented here and aver that other courts have reached contrary conclusions.

98. Congress's own history confirms the point. Congress amended the Act in 1974, creating the CFTC to oversee trading on DCMs due to concerns about "a patchwork of state regulations." *Flaherty*, 172 F.4th at 226. "The 1974 amendments also expanded the Act's reach from just agricultural products to all 'goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in.'" *Id.* (quoting 7 U.S.C. § 1a(9)).

**ANSWER**: The allegations of Paragraph 98 state legal conclusions, requiring no response, and purport to describe statutory history and quote judicial authority, which speak for themselves. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

99. The presumption against preemption does not apply here. The federal government has regulated derivatives markets continuously since 1922, *see generally Bd. of Trade of City of Chi.* v. *Olsen*, 262 U.S. 1 (1923) (assessing the constitutionality of the Grain Futures Act), and the presumption is not triggered in an area of longstanding federal presence, *see United States* v. *Locke*, 529 U.S. 89, 108 (2000). In any event, express preemptive language overcomes the presumption, and Congress supplied such language when it conferred "exclusive jurisdiction" on the CFTC. 7 U.S.C. § 2(a)(1)(A); *see Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.").

**ANSWER**: The allegations of Paragraph 99 state legal conclusions, requiring no response, and purport to describe judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

100. Novig does not contend that the Act preempts Missouri's regulation of gambling generally. Missouri remains free to license and police sportsbooks, casinos, and every other form of gambling conducted outside a federally designated contract market. Preemption reaches only trading on a market Congress placed within the CFTC's exclusive jurisdiction. *See Marshall* v. *Green Giant Co.*, 942 F.2d 539, 549

(8th Cir. 1991) ("[P]reemption can occur only if the CEA applies to the events in question.").

**ANSWER**: The allegations of Paragraph 100 state legal conclusions, requiring no response, purport to describe judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

101. The CFTC agrees. On October 9, 2026, the CFTC published an Interim Final Rule that codified its longstanding position that casino-style gambling products, including wagers placed on sportsbooks and casino games, are excluded from the "swap" definition and thus the CFTC's exclusive jurisdiction. *Further Definition of "Swap" to Exclude Casino-Style Gambling Products* 40, CFTC RIN 3038-AF81 (Oct. 9, 2026), https://perma.cc/8K55-4PXS. The CFTC adopted this rule to address "the erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," an interpretation that is contrary to the swap definition's "plain text." *Id.* at 9.

**ANSWER**: The allegations of Paragraph 101 state legal conclusions, requiring no response, and purport to describe the CFTC's October 9, 2026 Interim Final Rule, which speaks for itself. Defendants deny the allegations stated therein.

102. Neither savings clause in § 2(a)(1)(A) disturbs the exclusive-jurisdiction grant. The first is subordinated in its own text: "[e]xcept as hereinabove provided," nothing in the section supersedes or limits the jurisdiction of other federal or state regulatory authorities. 7 U.S.C. § 2(a)(1)(A). What "hereinabove" precedes is the

grant of exclusive jurisdiction, and that grant controls. The second savings clause preserves the jurisdiction of courts, not of state gaming regulators. The "prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction," and that the "second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction." *Flaherty*, 172 F.4th at 230–31; *accord Minnesota*, 2026 WL 2150211, at *11. And the preservation of state common-law actions carries no implication that Congress left room for state regulatory authority over on-exchange trading; the courts of appeals have long held the opposite. *See Kerr* v. *First Commodity Corp. of Bos.*, 735 F.2d 281, 288 (8th Cir. 1984) (noting the CEA's "wide-ranging scheme of federal regulation"); *Kotz* v. *Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading]."). The carveouts and the exclusive grant operate together, and both point to preemption.

**ANSWER**: The allegations of Paragraph 102 purport to describe statutory text and quote judicial authority, which speak for themselves, state legal conclusions, requiring no response. To the extent a response is required, Defendants deny the allegations stated therein.

103. The Act's other provisions confirm rather than defeat preemption. Section 16(e)(1) preserves state authority over transactions "not conducted on or subject to the rules of a registered entity." 7 U.S.C. § 16(e)(1)(B)(i). However, "registered entities include DCMs, so that limiting principle does not apply." *Flaherty*, 172 F.4th at 229. Congress addressed state enforcement directly as well.

Section 13a-2(1) authorizes state officials to sue over conduct violating the Act or the CFTC's rules, but withholds that authority as to federally registered entities. 7 U.S.C. § 13a-2(1). Congress thus calibrated the role of state officials with respect to this industry rather than leaving it at large, and the role it assigned them does not extend to the exchanges the CFTC designates.

**<u>ANSWER</u>**: The allegations of Paragraph 103 purport to describe statutory text and quote judicial authority, which speak for themselves, and state legal conclusions, requiring no response. To the extent a response is required, Defendants deny the allegations stated therein.

104. Novig is not an unregistered entity operating off-exchange. It is designated by the CFTC, supervised by the CFTC, and subject to suspension or revocation of its designation by the CFTC. *See* 7 U.S.C. § 8(b).

**<u>ANSWER</u>**: Paragraph 104 states legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations stated therein.

105. Field preemption applies where Congress enacts a "scheme of federal regulation . . . so pervasive . . . that [it] left no room for the States to supplement it," or where a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

**ANSWER**: The allegations of Paragraph 105 purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

106. The analysis begins by identifying the field. *See Kansas* v. *Garcia*, 589 U.S. 191, 208 (2020). Courts must take care not to define it "too broadly." *Sikkelee* v. *Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016).

**ANSWER**: The allegations of Paragraph 105 purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

107. The field here is not gambling. It is the regulation of trading on federally designated contract markets—the discrete activity over which Congress conferred exclusive jurisdiction. The Court of Appeals for the Third Circuit so held: "[T]he District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)." *Flaherty*, 172 F.4th at 229. The preempted field is accordingly "transactions involving 'swaps' over which the CFTC has exclusive jurisdiction." *Minnesota*, 2026 WL 2150211, at *14.

**ANSWER**: The allegations of Paragraph 107 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

108. Congress has occupied that field completely. The Act and the CFTC's regulations govern who may operate a designated contract market, the standards for

obtaining and retaining designation, the contracts that may be listed and the procedures for listing them, the conduct of trading, the exchange's surveillance and enforcement duties, its recordkeeping and reporting obligations, its governance, its treatment of participants, and the consequences of noncompliance. *See* 7 U.S.C. §§ 2(e), 6(a)(1), 7, 7a-2, 8(b); 17 C.F.R. pt. 38; 17 C.F.R. pt. 40.

**ANSWER**: The allegations of Paragraph 108 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

109. Conflict preemption applies where compliance with both state and federal law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941).

**ANSWER**: The allegations of Paragraph 110 purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

110. Missouri's regime is structurally bounded by design. Missouri requires sports-wagering platforms to obtain a license and pay state taxes and fees. On Defendants' theory, an exchange offering sports-related event contracts to Missouri residents must therefore exclude Missouri residents unless it submits to a state licensing regime incompatible with its exchange model. Mo. Const. art. III, § 39(g)(6), (10)(a). The practical effect is a geographic exclusion from Novig's federally regulated market.

**ANSWER**: The allegations of Paragraph 110 state legal conclusions and quote statutory authority, which speaks for itself. No response is required; to the extent a response is required, Defendants admit the Novig is subject to its licensing and taxation requirements but otherwise deny the allegations stated therein.

111. Federal law imposes the opposite obligation. A designated contract market must "provide its members . . . with impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1).

**ANSWER**: The allegations of Paragraph 110 state legal conclusions and quote regulatory authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

112. Beyond the regulatory conflict lies a structural one. An event contract executes only when a buyer and a seller are matched at the same price. An exchange confined to the residents of a single state, and required to replicate that confinement in every other state, does not operate a thinner market; in many contracts it operates no market at all. The obstacle is not the expense of compliance, but rather the destruction of the exchange.

**ANSWER**: Paragraph 112 states argument and legal conclusions to which no response is required; to the extent a response is required, Defendants deny the allegations of Paragraph 112.

113. State enforcement of the kind Defendants threaten would frustrate Congress's objectives. Congress created the CFTC and conferred exclusive

jurisdiction on it to eliminate the patchwork of state regulation and bring futures trading under a uniform national framework. State enforcement of gambling laws against a federally designated contract market "is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. Permitting each state to decide for itself which contracts a federally designated exchange may list would make the most restrictive state's standard the effective national rule—an outcome the CEA was enacted to prevent, and one Missouri's licensing and geographic restrictions make concrete.

**ANSWER**: The allegations of Paragraph 113 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

114. State law is preempted when its application would directly affect trading on or the operation of a futures market. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156. Applied to a designated contract market, that standard is satisfied. *Minnesota*, 2026 WL 2150211, at *14 ("[I]t appears likely that the Minnesota law will regulate transactions over which the CFTC has 'exclusive jurisdiction.' Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their express-preemption claims."); *see Raoul*, 2026 WL 2969682, at *18 (finding that Kalshi, Coinbase, and the CFTC "are likely to succeed in demonstrating that several" of Illinois' gambling laws are preempted). Missouri's laws, as Defendants would apply them, would require Novig either to obtain a state license and operate within

Missouri-specific restrictions or to exclude Missouri participants, thereby dictating who may transact on Novig's exchange.

**ANSWER**: The allegations of Paragraph 114 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants admit the Novig is subject to its licensing and regulatory requirements but otherwise deny the allegations stated therein.

115. Defendants' position rests on the premise that these contracts involve gaming and therefore belong to the states. The structure of the Act forecloses that premise.

**ANSWER**: Defendants admit that it is their position that sports wagering is subject to Missouri taxation and licensing. The remaining allegations of Paragraph 115 state legal conclusions to which no response is required. To the extent a response is required for the remaining allegations, Defendants deny them.

116. In Dodd-Frank, Congress enacted a Special Rule for event contracts. The CFTC "may determine" that an event contract is "contrary to the public interest" where it "involve[s]" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i). Where the CFTC so determines, the contract may not be listed. Otherwise, it may.

**ANSWER**: The allegations of Paragraph 116 state legal conclusions and quote statutory text, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

117. That provision presupposes that event contracts involving gaming are within the CFTC's jurisdiction. If such contracts escaped federal authority the moment they touched gaming, the Special Rule would have nothing to operate on, and courts do not read statutory provisions into irrelevance. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("[T]hat kind of superfluity, in and of itself, refutes [petitioner's] reading."). Congress assigned the gaming question to the CFTC, not to the states.

**ANSWER**: The allegations of Paragraph 117 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

118. Two instruments—an exchange-traded event contract and a wager—may reference the same game, but they are different in kind, and economic resemblance does not determine regulatory classification. The CFTC agrees. When implementing the Dodd-Frank amendments, the CFTC declined to bring traditional insurance products within the swap definition even though those products replicate the economics of instruments that are regulated as swaps, explaining that they had not been "historically treated" or "regulated" as swaps and were "subject to different regulatory regimes" under state law. Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,211–12 (Aug. 13, 2012). The CFTC's exclusive authority over exchange-traded event contracts leaves untouched the States' longstanding role in regulating wagers accepted by a house. The CFTC

has drawn the same distinction between the two market structures, observing that the structure of a prediction market "is inapposite to that of legalized sports gambling, where the gaming company typically controls and adjusts the gambling odds." 91 Fed. Reg. at 35,807 n.6.

**ANSWER**: The allegations of Paragraph 118 state legal conclusions and purport to describe the CFTC's rulemaking statements, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

119. Novig's exchange functions as a venue. Its revenue does not generally depend on whether any participant's position resolves favorably. Price formation occurs among participants transacting across a national market—the same process that sets a listed security's price on a public exchange. Like other designated contract markets, Novig administers a market-maker function that supplies baseline depth and liquidity so that participants can enter and exit positions efficiently. That function is a standard feature of exchange design rather than a departure from it.

**ANSWER**: Paragraph 119 states legal conclusions and describes Novig's operations. No response is required as to the legal conclusions; to the extent a response is required, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief as to the truth of the factual allegations concerning Novig's operations and therefore deny them.

120. The sportsbook model inverts these features. The operator dictates the terms on which it will accept a wager and takes the other side of every one. *See*

*United States* v. *McCoy*, 539 F.2d 1050, 1059 (5th Cir. 1976). Its posted odds express its own exposure and revenue objectives inside a licensed territory rather than the result of competitive bidding. Its economic interest is therefore opposed to its customers because it earns the "vig" priced into those odds. *See United States* v. *Greco*, 619 F.2d 635, 637 (7th Cir. 1980) ("This amount of profit to the bookmaker is commonly referred to as 'vigorish,' 'vig' or 'juice.'").

**ANSWER**: The allegations of Paragraph 120 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

121. Prices on Novig's exchange are generally set by participants, whose orders match by price and time priority through a non-discriminatory algorithm. Novig's revenue does not depend on whether any participant's position resolves favorably. The practice that gave rise to the distinction between an exchange and a sportsbook—restricting or excluding customers because they win too often—is the practice Novig was founded to eliminate. Novig applies position and payout limits, as every exchange does, to manage settlement risk and preserve orderly markets; it does not apply them to penalize participants for trading successfully. Novig also makes each participant's historical trading performance available directly in its platform, rather than requiring the request-and-review process a customer must navigate to obtain that information from a sportsbook. A venue that takes no position against its participants has no reason to obscure how they are performing.

**<u>ANSWER</u>**: Paragraph 121 states legal conclusions and describes Novig's operations. No response is required as to the legal conclusions; to the extent a response is required, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief as to the truth of the factual allegations concerning Novig's operations and therefore deny them.

122. Congress recognized that hedging on an exchange depends on the presence of willing counterparties, not on a house. *See Curran*, 456 U.S. at 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

**<u>ANSWER</u>**: The allegations of Paragraph 122 purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

123. A party seeking a preliminary injunction must show a likelihood of success on the merits, a likelihood of irreparable harm absent relief, that the balance of equities favors relief, and that an injunction serves the public interest. *Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Novig satisfies that standard.

**<u>ANSWER</u>**: The allegations of Paragraph 123 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

124. Novig will suffer irreparable harm absent relief, and that harm is "certain and great and of such imminence that there is a clear and present need for

equitable relief." *Dakotans for Health* v. *Noem*, 52 F.4th 381, 392 (8th Cir. 2022). A regulated party is irreparably injured when it must choose between abandoning lawful activity and incurring ruinous civil and criminal liability under a preempted state law. *See Ex parte Young*, 209 U.S. at 148. The Court of Appeals for the Sixth Circuit so held on closely analogous facts in *Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025), finding irreparable injury where a State sought to enforce its wagering law against an out-of-state wagering platform in conflict with a federal statute. Novig stands in the same position.

**ANSWER**: The allegations of Paragraph 124 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

125. That is the choice Novig faces. If it offers event contracts to Missouri customers, it risks the enforcement action threatened by the Attorney General in the September 17 cease-and-desist letter. Such enforcement action may include criminal penalties pursuant to Mo. Rev. Stat. ch. 572, monetary fines pursuant to Mo. Rev. Stat. § 407.020, and abatement of a public nuisance pursuant to Mo. Rev. Stat. § 572.090. If Novig withholds the product from Missouri, it forfeits access to Missouri participants entirely, sacrifices the liquidity a national exchange requires, and loses customers and goodwill.

**ANSWER**: The allegations of Paragraph 125 state legal conclusions and quote statutory authority, which speaks for itself. To the extent a response is required,

Defendants admit that Novig is subject to enforcement action under Missouri law, but otherwise deny the allegations stated in Paragraph 125.

126. Courts confronting the same dilemma have found it irreparable. If Defendants pursue enforcement action against Novig, the DCM "will either continue to offer [its] event contracts to [Missouri] users and face potential felony charges, or [it] will need to take steps to exit the market" for its trades in Missouri. *Minnesota*, 2026 WL 2150211, at *16.

**<u>ANSWER</u>**: The allegations of Paragraph 126 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

127. Loss of goodwill and reputation is irreparable in this Circuit. *See United Healthcare Ins. Co.* v. *AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."). Other courts have found the same harms sufficient in these very cases. *See Minnesota*, 2026 WL 2150211, at *17 ("Such reputational harm and damage to the goodwill that Kalshi and Polymarket US have fostered with users of their platforms adds to the irreparable injury described above.").

**<u>ANSWER</u>**: The allegations of Paragraph 127 state legal conclusions and purport to describe and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

128. Sovereign immunity forecloses any later remedy. Because Novig could not recover damages from Defendants even if it ultimately prevailed, the losses it would sustain in the interim are by definition irreparable. *See Minnesota*, 2026 WL 2150211, at *16.

**ANSWER**: The allegations of Paragraph 128 state legal conclusions and cite judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny that Novig has shown entitlement to relief.

129. Novig need not incur liability before seeking relief. *See Free Enter. Fund* v. *Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."); *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Steffel* v. *Thompson*, 415 U.S. 452, 459 (1974).

**ANSWER**: The allegations of Paragraph 129 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

130. The balance of equities favors relief. A State has no cognizable interest in enforcing a preempted law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988); *Otto* v. *City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."). It is true that preventing a State from effectuating statutes enacted by its representatives can itself constitute an injury, but that principle presupposes a valid statute. Where

the state law is preempted as applied, the State is deprived of nothing to which it is entitled, and the interest it asserts carries correspondingly little weight.

**ANSWER**: The allegations of Paragraph 130 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

131. Where a state law is likely preempted, the harm to the State from an injunction is correspondingly reduced. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen a state law is likely preempted, the harm to the state by temporarily enjoining enforcement of that law is diminished"); *Raoul*, 2026 WL 2969682, at *18 ("Neither Illinois nor the public has much interest in enforcing laws that are likely preempted."). Defendants retain every enforcement tool should they ultimately prevail. Weighing on the other side are the reliance interests that have formed around a market the CFTC has permitted to operate. Exchanges have devoted substantial resources to building infrastructure that complies with the Act in reliance on the federal designation the CFTC grants, and participants have entered positions on the strength of it. Defendants' theory would unsettle those interests retroactively.

**ANSWER**: The allegations of Paragraph 131 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

132. The public interest favors relief. "If the Act preempts [state] law, then the public interest is best served by *enforcing* the Act." *Flaherty*, 172 F.4th at 232 (emphasis added). The public also has an interest in the integrity of the uniform

national framework Congress designed for derivatives markets, in the informational value of prediction-market prices, which are theoretically more efficient the broader and more liquid the market, and in the supremacy of federal law. *See United States* v. *Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

**ANSWER**: The allegations of Paragraph 132 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

133. A preliminary injunction would hold the parties' legal positions in place pending resolution of a question on which courts have divided, rather than permit criminal liability to attach to a federally designated exchange while that question remains open. The Eighth Circuit is currently hearing an appeal that raises the identical question, with briefing set to conclude on December 6, 2026. *See* Appeal Briefing Schedule Order, *KalshiEX, LLC* v. *Bird*, No. 26-2874 (8th Cir. Sept. 17, 2026). A ruling at this stage "preserve[s] the status quo until the merits of [Novig's] claims can be fully adjudicated." *Minnesota*, 2026 WL 2150211, at *18.

**ANSWER**: The allegations of Paragraph 133 state legal conclusions and quote judicial authority, which speaks for itself. No response is required; to the extent a response is required, Defendants deny the allegations stated therein.

134. Novig accordingly seeks a declaration that the Missouri laws identified above are preempted as applied to event contracts traded on its federally designated contract market, and an injunction restraining their enforcement against Novig.

**ANSWER**: Paragraph 134 states legal conclusions and describes the relief Novig seeks, to which no response is required. To the extent a response is required, Defendants deny that Novig is entitled to any relief.

## RESPONSE TO PRAYER FOR RELIEF

The unnumbered paragraphs following the heading "Prayer for Relief," including subparagraphs (i) through (iii), set forth the relief Novig requests and require no response. To the extent a response is required, Defendants deny that Novig is entitled to the requested relief, or to any relief whatsoever, and pray the Complaint be dismissed with prejudice.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof they would not otherwise bear, Defendants assert the following affirmative and additional defenses. Defendants deny all allegations made in any heading, footnote, or non-numbered paragraph of the Complaint, and deny that Novig has stated any lawful claim against them.

**First Defense (Failure to State a Claim).** The Complaint fails to state a claim upon which relief can be granted.

**Second Defense (Ripeness).** Novig's claim is not ripe. No enforcement action in state court has commenced, and Novig's asserted injuries rest on contingent future events.

**<u>Third Defense (Abstention and Comity).</u>** The relief Novig seeks is barred or should be withheld under principles of equity, comity, and federalism, which counsel against federal interference with a State's fiscal operations and criminal proceedings.

**<u>Fourth Defense (Tax Injunction Act).</u>** This Court lacks jurisdiction over Novig's action and the relief Novig seeks is barred pursuant to the Tax Injunction Act, 28 U.S.C. § 1341.

**<u>Fifth Defense (Declaratory Judgment Act Discretion).</u>** The Court should decline, in its discretion, to entertain Novig's request for declaratory relief under 28 U.S.C. § 2201.

**<u>Sixth Defense (Adequate Remedy at Law; No Irreparable Harm).</u>** Novig is not entitled to equitable relief because it has an adequate remedy at law, including the ability to raise preemption as a defense in any enforcement proceeding.

**<u>Seventh Defense (Unclean Hands).</u>** Novig's request for equitable relief is barred, in whole or in part, by the doctrine of unclean hands because Novig failed to attempt to secure a license to engage in sports wagering in the State of Missouri.

**<u>Eighth Defense (Sovereign and Official Immunity).</u>** Defendants are immune from suit to the extent the relief Novig seeks exceeds the prospective relief permitted under *Ex parte Young*, and Defendants have not waived their sovereign or official immunity.

**<u>Ninth Defense (Anti-Injunction Act).</u>** This Court lacks jurisdiction to entertain Novig's action under the Anti-Injunction Act, 28 U.S.C. § 2283.

**<u>Reservation of Defenses.</u>** Defendants reserve the right to assert any additional defenses that may become apparent as the litigation progresses.

## <u>COUNTERCLAIMS</u>

Defendant Catherine L. Hanaway, in her official capacity as Attorney General of the State of Missouri (the "Attorney General"), by and through undersigned counsel, asserts the following Counterclaims against Plaintiff and Counter-Defendant Ludlow Exchange, LLC d/b/a Novig ("Novig"), and alleges as follows:

## NATURE OF THE COUNTERCLAIMS

1. Novig operates an online platform through which it offers, accepts, and settles wagers on the outcomes of professional and collegiate sporting events placed by persons located in Missouri.

2. Novig is not licensed by the Missouri Gaming Commission and offers these wagers in violation of Missouri law.

3. By accepting money and other financial instruments from Missouri residents in connection with internet sports wagering that is unlawful under Missouri law, Novig violates the Unlawful Internet Gambling Enforcement Act of 2006, engages in an unlawful practice under the Missouri Merchandising Practices Act, and maintains a public nuisance under Missouri common law.

4. The Attorney General brings these Counterclaims to enjoin Novig's unlawful conduct and to obtain the restitution, civil penalties, and other relief authorized by law.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over Counterclaim I under 28 U.S.C. § 1331 because it arises under the laws of the United States, and under 31 U.S.C. § 5365(a), which vests the district courts with original and exclusive jurisdiction to prevent and restrain restricted transactions.

6. This Court has supplemental jurisdiction over Counterclaim II and Counterclaim III under 28 U.S.C. § 1367(a) because those claims are so related to Novig's claim, should this Court find it has jurisdiction over it, and to Counterclaim I that they form part of the same case or controversy. Novig has invoked this Court's jurisdiction and placed the lawfulness of its Missouri operations directly at issue.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these Counterclaims occurred in this District, where Novig offers and accepts sports wagers from Missouri residents.

## THE PARTIES

8. Counter-Plaintiff Catherine L. Hanaway is the Attorney General of the State of Missouri, the State's chief legal officer, and is authorized to enforce the Unlawful Internet Gambling Enforcement Act of 2006, the Missouri Merchandising Practices Act, and Missouri's laws governing gambling and public nuisance.

9. Counter-Defendant Ludlow Exchange, LLC d/b/a Novig is a limited liability company that offers sports event contracts to customers located in Missouri.

## COMMON FACTUAL ALLEGATIONS

10. Novig offers, and accepts stakes on, binary wager contracts tied to the outcomes of professional and collegiate sporting events. A participant takes a "yes"

or “no” position on whether a defined sporting outcome will occur, and at settlement the participant who correctly predicts the outcome receives payment while the other participant receives nothing.

11. Novig markets and offers these wagers to persons located in Missouri over the internet and accepts money, credit, electronic fund transfers, and other financial instruments from those persons in connection with their participation.

12. Novig is not licensed by the Missouri Gaming Commission and has not paid the taxes and fees required of licensed sports-wagering operators under Mo. Const. art. III, § 39(g).

13. Under Missouri law, a person engages in unlawful gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome. Mo. Rev. Stat. § 572.010(4), (13).

14. Offering online sports wagering to Missourians without a Missouri Gaming Commission license is unlawful. Mo. Rev. Stat. § 572.020.

15. Missouri is irreparably harmed by Novig’s continued operation because it siphons business from lawfully licensed sports wagering, costing Missouri an unquantified amount of tax revenue.

16. Missouri is also irreparably harmed by Novig’s continued operation because, as an unlicensed entity, it does not comply with Missouri’s licensing laws that require

the use of reasonable efforts to protect minors and to prevent false, misleading, or deceptive promotional materials. Mo. Const. art. III, § 39(g).9(a)(4)(h), (g).14(b).

17. Unless enjoined, Novig will continue accepting wagers and associated financial instruments from Missouri residents in violation of the taxation and licensing requirements that govern sports wagering in Missouri.

18. The resulting harm is ongoing and cannot be fully remedied by a later award of damages because it impairs lawfully licensed sports wagering entities' market share and Missouri's ability to protect consumers through licensed and regulated sports wagering.

19. The balance of equities favors equitable relief because an injunction would require Novig to comply with the same licensing and regulatory framework that applies to other sports-wagering operators serving Missouri. Meanwhile, denial of equitable relief will prevent Missouri from being able to enforce its law and protect Missouri citizens.

20. The public interest favors enforcement of Missouri law to protect "educational institutions in Missouri" that depend on tax revenue from the sports-wagering licensing scheme, Mo. Const. art. III, § 39(g).1, to protect consumers and minors from the harms of unregulated gambling, and to ensure the fair treatment of licensed operators that comply with Missouri law.

## COUNTERCLAIM I

## VIOLATION OF THE UNLAWFUL INTERNET GAMBLING ENFORCEMENT ACT OF 2006, 31 U.S.C. § 5363 *ET SEQ.*

21. The Attorney General incorporates by reference Paragraphs 1 through 20 of these Counterclaims.

22. The Unlawful Internet Gambling Enforcement Act of 2006 ("the Act") authorizes the Attorney General of a State in which a restricted transaction under the Act has been or will be initiated, received, or otherwise made to institute proceedings in federal court to prevent or restrain that violation or threatened violation, and to obtain a temporary restraining order, preliminary injunction, or injunction. 31 U.S.C. § 5365(b)(2); 12 C.F.R. § 233.3, and 31 C.F.R. § 132.3.

23. A restricted transaction occurs under the Act when a person engaged in the business of betting or wagering accepts credit, electronic fund transfers, checks, stablecoins, or the proceeds of other financial transactions in connection with "unlawful internet gambling." 31 U.S.C. §§ 5362(7), 5363.

24. The Act defines "unlawful Internet gambling" as placing, receiving, or otherwise knowingly transmitting a bet or wager by any means involving the use, at least in part, of the Internet where the bet or wager is unlawful under any applicable Federal or State law in the State in which the bet or wager is initiated, received, or otherwise made. 31 U.S.C. § 5362(10)(A).

25. "[T]he Act does not itself outlaw any gambling activity, but rather incorporates other Federal or State law related to gambling." *Interactive Media Ent. & Gaming Ass'n v. Att'y Gen.*, 580 F.3d 113, 116 (3d Cir. 2009) (footnote omitted).

26. Novig is a person engaged in the business of betting or wagering within the meaning of 31 U.S.C. § 5362(2).

27. Novig is not a financial transaction provider, interactive computer service, or telecommunications service excluded from that definition.

28. Sports wagers placed by Missouri residents through Novig's internet platform are unlawful under Missouri law, including Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. ch. 572, because they are placed with an operator that is not licensed by the Missouri Gaming Commission. Those wagers are therefore "unlawful Internet gambling" under 31 U.S.C. § 5362(10)(A).

29. Novig knowingly accepts credit, electronic fund transfers, checks, and the proceeds of other financial transactions from Missouri residents in connection with their participation in that unlawful Internet gambling, in violation of 31 U.S.C. § 5363.

30. Because Novig's acceptance of financial instruments from Missouri residents constitutes a restricted transaction or facilitation of a restricted transaction that has been and will be initiated or received in Missouri, the Attorney General is entitled to a preliminary and permanent injunction restraining Novig's violations. 31 U.S.C. § 5365(b)(2)(B).

## COUNTERCLAIM II

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. REV. STAT. § 407.020

31. The Attorney General incorporates by reference Paragraphs 1 through 30 of these Counterclaims.

32. The Missouri Merchandising Practices Act ("the MMPA") declares unlawful "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce" in or from the State of Missouri. Mo. Rev. Stat. § 407.020.1.

33. "Merchandise" under the MMPA means "any objects, wares, goods, commodities, intangibles, real estate or services," Mo. Rev. Stat. § 407.010(4), a definition Missouri courts construe broadly. *See Planned Parenthood of St. Louis Region & Sw. Mo. v. Bailey*, 715 S.W.3d 167, 180 (Mo. Ct. App. 2025). Novig's sports event contracts, and the platform and services through which Novig offers them, are "merchandise" within this definition.

34. Novig places that merchandise into "trade or commerce" by advertising, offering for sale, and selling it to persons located in Missouri; the terms "trade" and "commerce" include any trade or commerce directly or indirectly affecting the people of Missouri. Mo. Rev. Stat. § 407.010(7).

35. An "unfair practice" under the MMPA is any practice that offends public policy as established by the Constitution, statutes, or common law of Missouri, or is unethical, oppressive, or unscrupulous, and that presents a risk of, or causes, substantial injury to consumers; proof of deception, fraud, or misrepresentation is not required. 15 C.S.R. § 60-8.020.

36. Novig's offering and sale of unlicensed sports wagering to Missouri residents is an unfair practice. It offends the public policy of Missouri established by Mo. Const. art. III, § 39(g) and Mo. Rev. Stat. ch. 572, which prohibit unlicensed sports wagering, and it presents a risk of, and causes, substantial injury to Missouri consumers, who are deprived of the statutory protections, consumer safeguards, and oversight that attend licensed sports wagering.

37. The Attorney General is authorized to enforce the MMPA to protect Missouri consumers. *Planned Parenthood of St. Louis Region & Sw. Mo.*, 715 S.W.3d at 180. Upon a showing that a person has engaged in, is engaging in, or is about to engage in a practice declared unlawful by the MMPA, the Attorney General may obtain an injunction, Mo. Rev. Stat. § 407.100.1; an order of restitution payable to the State for distribution to injured persons, Mo. Rev. Stat. § 407.100.4; and a civil penalty of up to one thousand dollars per violation, Mo. Rev. Stat. § 407.100.6.

38. Given the foregoing, Novig has violated and continues to violate Mo. Rev. Stat. § 407.020, and the Attorney General is entitled to preliminary and permanent injunctive relief, restitution, and civil penalties as provided by Mo. Rev. Stat. § 407.100.

**COUNTERCLAIM III**

**PUBLIC NUISANCE UNDER MISSOURI COMMON LAW**

39. The Attorney General incorporates by reference Paragraphs 1 through 38 of these Counterclaims.

40. Under Missouri common law, acts done in violation of the law, or which are against good morals or public decency, and which result in injury to the public,

constitute a public nuisance. *State ex rel. Igoe v. Joynt*, 110 S.W.2d 737, 740–41 (Mo. 1937) (en banc). The Missouri Supreme Court has held that the maintenance of a gambling operation, incapable of lawful use and set up for public play, is a public nuisance and an offense to public order and welfare. *Id.* More generally, a public nuisance is an unreasonable interference with a right common to the general public, encompassing the public health, safety, peace, comfort, or convenience. *State ex rel. Dresser Indus., Inc. v. Ruddy*, 592 S.W.2d 789, 792 (Mo. 1980) (en banc).

41. In determining whether an operation constitutes unlawful gambling, the test long applied in Missouri is not whether the activity contains an element of chance or of skill, but which is the dominating element; the chief element of gambling is the chance of winning or losing. *Joynt*, 110 S.W.2d at 740.

42. Novig's sports-wagering operation is unlawful gambling. Participants stake money upon the outcomes of sporting events not within their control or influence, upon an understanding that they will receive something of value in the event of a correct prediction; the dominating element is chance, and the operation is conducted without the license Missouri law requires.

43. Novig conducts and maintains this unlawful gambling operation for public participation by persons throughout Missouri over the internet. Novig's conduct violates Missouri law, offends the public policy and welfare of the State, and causes injury to the public of Missouri, and therefore constitutes a public nuisance.

44. The Attorney General is entitled to a judgment declaring Novig's operation a public nuisance and preliminarily and permanently enjoining its continuation.

## PRAYER FOR RELIEF

WHEREFORE, Defendants and Counter-Plaintiff pray this Court:

A. Deny Novig's requested declaratory and injunctive relief in its entirety and dismiss its Complaint with prejudice;

B. On Counterclaim I, enter judgment that Novig has violated 31 U.S.C. § 5363 and enter a temporary restraining order, preliminary injunction, and permanent injunction under 31 U.S.C. § 5365, restraining Novig from accepting financial instruments from Missouri residents in connection with unlawful Internet gambling;

C. On Counterclaim II, enter judgment that Novig has violated Mo. Rev. Stat. § 407.020, preliminarily and permanently enjoin Novig's unlawful practices, and award restitution and civil penalties of up to one thousand dollars per violation under Mo. Rev. Stat. § 407.100, together with the costs of investigation and prosecution;

D. On Counterclaim III, enter judgment declaring Novig's operation a public nuisance and preliminarily and permanently enjoining and abating it;

E. Award Defendants their costs; and

F. Grant such other and further relief as the Court deems just and proper.

Dated: November 9, 2026

Respectfully submitted,

**CATHERINE L. HANAWAY**
ATTORNEY GENERAL

s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
*Solicitor General*
William James Seidleck, #77794(MO)
*Principal Deputy Solicitor General*
Graham Miller, #77656(MO)
*Deputy Solicitor General*
Aadir Aktar Ibrahim Khan, #79449(MO)
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
Old Post Office Building
815 Olive Street, Suite 200
St. Louis, MO 63101
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
William.Seidleck@ago.mo.gov
Graham.Miller@ago.mo.gov
Aadir.Khan@ago.mo.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of this Answer and these Counterclaims were filed electronically through the Court's electronic filing system to be served electronically on counsel for all parties on November 9, 2026.

s/ *Louis J. Capozzi III*